IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No. _____

| | |
|---|---|
| GLENPEACE LLC d/b/a "The Village;" ) <br> JO HEAVEN INC. d/b/a "Alchemy;" and ) <br> DANIEL A. LOVENHEIM, ) <br> ) <br>         Plaintiffs, ) <br> ) <br>    v. ) <br> ) <br> CITY OF RALEIGH, a body politic; ) <br> MARCHELL ADAMS-DAVID, in her ) <br> individual capacity and official capacity ) <br> as City Manager; CAPT. ROBERT ) <br> PATRICK BOWEN, in his individual ) <br> capacity and official capacity for the ) <br> Raleigh Police Department; ROBIN ) <br> LEA TATUM, in her individual capacity ) <br> and former official capacity as Raleigh ) <br> City Attorney; and WHITNEY LEIGH ) <br> SHOENFELD, in her individual ) <br> capacity and her official capacity for the ) <br> Office of Special Events and ) <br> Hospitality. ) <br> ) <br>         Defendants. ) | **VERIFIED COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs Glenpeace LLC d/b/a "The Village," Jo Heaven Inc. d/b/a "Alchemy," and Daniel A. Lovenheim complaining of Defendants, allege and state the following:

## OVERVIEW AND INTRODUCTION

1. This case involves targeted misconduct, selective persecution of, and retaliation for protected First Amendment conduct against Plaintiffs by managers of the City of Raleigh ("COR") and COR Police Department. In an effort to compel

compliance with a now repealed unconstitutional, convoluted, self-contradictory and vague scheme of noise and content-based "amplified entertainment" permitting ordinances and enforcement policies, Defendants violated Plaintiffs' federal and state rights through a repeated pattern of harassment, threats, and, eventually, false enforcement actions forcing the closure of one of Plaintiffs' businesses known as "The Village" and forcing the partial closure of another one of the Plaintiffs' businesses known as Alchemy. Defendants further threatened the closure of Plaintiffs' other businesses if Plaintiffs did not accede to Defendants' demands.

2.     Through its managers and officers, Defendants' conduct and actions caused damage to Plaintiffs for which Plaintiffs seek redress.

3.     Plaintiffs further seek to invalidate COR's unlawful regulation of Plaintiffs' operations and selective enforcement of the same under the guise of a taxing scheme and in retaliation for Plaintiffs' and their patrons' constitutionally protected speech and actions.

4.     COR's former noise regulation ordinances generally comprised three levels: (1) a city-wide, general noise regulations (Raleigh City Code ("RCC") § 12-5001 – 12-5011); (2) a city-wide, permitting process for "Amplified Entertainment Permits" ("AEP") for businesses using amplified sound for "Entertainment" purposes indoors and outdoors (RCC § 12-2118 – 12-2224); and (3) an overlay ordinance and permitting scheme for designated hospitality districts known as "Hospitality District Entertainment Permits" ("HDEP") (RCC § 12-2126 – 12-

2130). True and accurate copies of these three regulatory schemes are attached as **Exhibits 1**, **2**, and **3**, respectively.

5. On 2 January 2024, COR updated its former noise regulation ordinances and enacted a subjective scheme. A true and accurate copy of the new regulatory schemes is attached as **Exhibit 4.**

## <u>PARTIES</u>

1. Plaintiff Glenpeace LLC d/b/a "The Village," is a North Carolina limited liability company doing business as a "Bar" at 513 West Peace Street, 517 West Peace Street, and 616 Glenwood Avenue, Raleigh, North Carolina 27603 including outdoor space for patrons. The Village operates within The Glenwood South Entertainment District designated by defendant as further described below. The Village holds the following permits from the North Carolina ABC Commission: Malt Beverage On Premise (00288997AJ), Unfortified Wine On Premise (00288997AL), Fortified Wine On Premise (00288997AN), and Mixed Beverages Bar (00288997MB). The Village applied for a Nightlife permit from COR; has had all requisite inspections performed and approved and paid for the Nightlife permit which COR refuses to issue.

2. Plaintiff Jo Heaven Inc. d/b/a "Alchemy," is a North Carolina corporation doing business as a "Bar" at 606 Glenwood, Avenue, Raleigh, North Carolina 27603 including outdoor space for patrons. Alchemy operates within The Glenwood South Entertainment District designated by defendant as further described below. Alchemy holds the following permits from the North Carolina

ABC Commission: Malt Beverage On Premise (00188915AJ), Unfortified Wine On Premise (00188915AL), Fortified Wine On Premise (00188915AN), and Mixed Beverages Bar (00188915MB). Alchemy holds a Nightlife permit from COR.

3. Plaintiff Daniel A. Lovenheim ("Mr. Lovenheim") is a citizen and resident of Raleigh, Wake County, North Carolina, who has an ownership interest in each of the other two Plaintiffs.

4. Defendant City of Raleigh ("COR") is a municipal corporation organized and existing under the laws of North Carolina and located in Wake County, North Carolina. COR is a body politic and corporate with capacity to sue and be sued as provided in N.C. GEN. STAT. § 160A-11. 15. COR maintains and operates COR Police Department ("RPD"). Employees of RPD are employees and agents of COR, which bears legal responsibility under state law for the acts and omissions of RPD's employees undertaken in the course of their employment. COR is responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named Defendants herein.

5. On information and belief, COR waived governmental and sovereign immunity from the state law tort claims alleged herein pursuant to N.C. GEN. STAT. § 160A-485, either by participation in a government risk pool or through purchase of commercial insurance that will indemnify COR and its agents for any judgment against it or its agents named in this action. This waiver under N.C. GEN. STAT. § 160A-485 was in effect at all times relevant to the allegations made herein.

6.      Defendant Marchell Adams-David was appointed by the Raleigh City Council to become City Manager effective 1 January 2021[1] and oversees, among other things, the enforcement of COR's noise and sound regulations, Emergency Management, Special Events and Hospitality, and the Raleigh Police Department. She is sued in her individual and official capacities. Upon information and belief, she is a citizen and resident of Raleigh, Wake County, North Carolina. As explained below, Defendant Marchell Adams-David acted maliciously and corruptly in concert with others.

7.      Defendant Capt. Robert Patrick Bowen was, at times relevant to this matter, the officer in charge of the Hospitality Unit which polices the Glenwood South Hospitality District as described below. He is sued in his individual and official capacities. Upon information and belief, he is a citizen and resident of Wake Forest, Wake County, North Carolina. As explained below, Defendant Capt. Robert Patrick Bowen acted maliciously and corruptly in concert with others.

8.      Defendant Robin Lea Tatum was, at times relevant to this matter, the appointed City Attorney for COR and acted as COR's chief enforcement officer. Defendant Robin Lea Tatum resigned her role as COR's City Attorney. Her last day in that role was 1 May 2023. She is sued in her individual and former official capacities. Upon information and belief, she is a citizen and resident of Raleigh, Wake County, North Carolina. As explained below, Defendant Robin Lea Tatum

---

[1] https://raleighnc.gov/news/2020-11-04-city-council-names-new-raleigh-city-manager

acted maliciously and corruptly in concert with others.

9.     Defendant Whitney Leigh Shoenfeld was, at times relevant to this matter, the Interim Senior Manager of Emergency Management, Special Events, and Hospitality for COR and acted in concert with COR's other enforcement officers. She is sued in her individual and former official capacities. Upon information and belief, she is a citizen and resident of Raleigh, Wake County, North Carolina. As explained below, Defendant Whitney Shoenfeld acted maliciously and corruptly in concert with others.

10.    All individual Defendant actors sued herein are entitled under North Carolina law to indemnification by COR for any liability arising from the conduct described herein

## JURISDICTION AND VENUE

11.    This action arises, in part, under the First, Eighth, and Fourteenth Amendments to the United States Constitution, the Constitution of North Carolina, and the Declaratory Judgment Act.

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1357, and 42 U.S.C. § 1988 because the claims asserted by Plaintiff arise under the laws of the United States and seek redress for rights guaranteed by the United States Constitution and deprived under color of state law.

13.    Plaintiffs further invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any and all North Carolina state law claims and

causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

14.    This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

15.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 because (i) the events giving rise to the claim occurred in this District, and (ii) on information and belief, multiple Defendants reside within this District.

16.    Defendants are not immune under the Eleventh Amendment of the United States Constitution because of their direct role in enacting and selectively enforcing the unconstitutional noise and amplified entertainment ordinances, permitting schemes and other related practices and policies and in retaliating against Plaintiffs for their exercise of constitutionally protected rights.

## STANDING

17.    Plaintiffs have standing on their own behalf and on behalf of other individual citizens and businesses to seek relief for COR's unlawful restrictions of rights accorded to them by the First, Eighth, and Fourteenth Amendments to the United States Constitution and by Article I, §§ 1, 14, and 19 of the Constitution of North Carolina.

18.    Plaintiffs have standing to bring this action because they are personally aggrieved by defendant City of Raleigh's enactment and enforcement in at least one of the following ways:

a.      Their rights are being and have been restricted and curtailed by Defendants in the absence of a compelling governmental interest and in a manner not narrowly tailored to accomplishing a compelling governmental interest.

b.      They operated their businesses in communities of interest that were affected by Defendants' enactment and selective enforcement of an unconstitutional regulatory scheme for noise and "amplified entertainment."

c.      They operate their businesses in communities of interest that are affected by Defendants' enactment and selective enforcement of a new unconstitutional regulatory scheme for noise."

d.      Their ability to mount a meaningful challenge to Defendants' arbitrary and selective enforcement of these unconstitutional regulatory schemes is effectively extinguished and rendered null and void by the COR's codification scheme, internal appeals process, and continued conduct.

e.      This action is timely as some Plaintiffs have received citations for purported violations of the COR's new noise regulatory scheme and others have been served with or threatened with enforcement of same.

### The Former General, City-Wide Noise Ordinance
### Raleigh City Code §§ 12-5001 – 12-5011

19.      Prior to 3 February 2024, COR's general noise regulatory scheme prohibited "unnecessary noise" at certain places and certain times of the day and night. The ordinance defined "unnecessary noise" as "[a]ny excessive or unusually

loud sound or any sound which disturbs the peace and quiet of any neighborhood or which does annoy, disturb, injure or endanger the comfort, repose, health, peace or safety of reasonable persons of ordinary sensibilities or causes damage to property or business." RCC § 12-5001 (repealed).[2]

20.     In one part of COR Code, measurement techniques were described for measuring sound, including location of measurement, height of measurement, proximity of others to the meter, number of required measurements, calibration of the measuring equipment, and angle of the omnidirectional microphone picking up sounds. The same section made it unlawful to "interfere, through the use of sound or otherwise, with the taking of sound level measurements." RCC § 12-5002 (repealed).

21.     Despite that part of the former general ordinance requiring 100 readings at 10 second intervals (RCC § 12-5002(d)(3) (repealed)), the very next part of the general ordinance is contradictory, stating that only ten (10) readings above the decibel limits constitute a sufficient basis to declare a violation.

22.     The former general ordinance made it unlawful to emit sound that exceeds prescribed decibel readings from any source in particular districts, at particular times. RCC § 12-5003 (repealed).

23.     According to the World Health Organization ("WHO"), there are many factors in sound propagation and its pertinence to health and safety concerns,

---

[2] The entirety of the former general noise regulatory scheme is attached as **Exhibit 5**.

including: sound power level, sound pressure level, the difference between the two, non-directional sound in a free-field, directional sound in a free-field and unknown sound pressure level. *See* "Occupational noise" publication downloadable [here](#)[3] and the Occupational Safety and Health Administration Technical Manual Section III, Chapter 5, [here](#).[4]

    24.    OSHA describes sound pressure relative to perception on the follow scale:



---

3 *See* [https://www.who.int/publications/i/item/occupational-noise-assessing-the-burden-of-disease-from-work-related-hearing-impairment-at-national-and-local-levels](https://www.who.int/publications/i/item/occupational-noise-assessing-the-burden-of-disease-from-work-related-hearing-impairment-at-national-and-local-levels) if the embedded hypertext link is inoperable.
4 *See* [https://www.osha.gov/otm/section-3-health-hazards/chapter-5](https://www.osha.gov/otm/section-3-health-hazards/chapter-5) if the embedded hypertext link is inoperable.

25. The former general ordinance exempted some noises from the definition of unnecessary noises including "[e]mission of sound from any source or sources on public rights-of-way." RCC § 12-5004 (repealed).

26. Further, the former general ordinance declared it unlawful "to cause or permit to be made, any unreasonably loud, annoying, frightening, loud and disturbing or *unnecessary* noise. Specifically, it shall be unlawful to emit noise of such character, intensity or duration as to be detrimental to the life or health of reasonable persons of ordinary sensibilities." RCC § 12-5006 (repealed) (emphasis in original).

27. The former general ordinance also enumerated a non-exclusive list of 16 prohibited noises. RCC § 12-5007 (a)-(p) (repealed). In 1994, the North Carolina Court of Appeals affirmed a lower court's determination that a similar non-exclusive list of noises declared to be prohibited was overly broad and thus constitutionally impermissible. See *State v. Garren*, 117 N.C. App. 393, 451 S.E.2d 315, (1994).

28. Additionally, the former general ordinance stated a purported presumption in prosecution for noise violations that "[t]he complaints of two (2) or more *persons*, at least one (1) of whom resides in a different home from the other complaining *person* or *persons*, or the complaint of one or more *persons*, when combined with the complaint of a duly authorized investigating *person*, *shall* be prima facie evidence that such sound is a loud and annoying, frightening, loud and disturbing, unreasonably loud or *unnecessary* noise." Sec. 12-5009 (repealed)

(emphasis in original). The ordinance also shifts the burden to prove the applicability of any exception to noise restrictions onto the party benefitting from such an exception. RCC § 12-5010.

29.     The former general ordinance contained civil penalties and a process by which those who were issued a civil penalty could appeal to the Chief of Police, who could overturn the penalty or send the matter to arbitration. RCC § 12-5011(a) (repealed). COR could also seek injunctive relief to enforce the ordinance. Sec 12-5011(b) (repealed).

30.     The former general ordinance also stated that "[a]ny *person* who violates any provision of this chapter *shall* be deemed guilty of a misdemeanor punishable by imprisonment not to exceed thirty (30) days or by fine not to exceed five hundred dollars ($500.00). Each day of a continuing violation *shall* constitute a separate violation under this subsection." (emphasis in original.)

31.     The First Amendment provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. The First Amendment is applicable to the states through the Fourteenth Amendment, which provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. The North Carolina Constitution provides, in Article I, Section 14, that "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained . . ." The United States Supreme Court and lower federal courts recognize that musical expression is within the category of

"speech" that is safeguarded by the First Amendment.[5] This includes both the right to play and to receive speech protected by the First Amendment.[6]

32.     A court may forbid enforcement of a noise statute or ordinance for overbreadth where it "reaches more broadly than is reasonably necessary to protect legitimate state interests" "at the expense of First Amendment freedoms." *Reeves v. McConn*, 631 F.2d 377, 383 (1980), *reh'g denied*, 638 F.2d 762 (5th Cir. 1981). As the Fifth Circuit explained in *Reeves*,

> most citizens desire protection from unreasonable or disruptive levels of noise on the streets and from uninvited noise within the privacy of their homes. We say nothing today that prevents the city from granting that protection. HN4 When the city fears disruption, it may prohibit conduct that actually causes, or imminently threatens to cause, material and substantial disruption of the community or invasion of the rights of others. Or the city may reasonably prohibit kinds or degrees of sound amplification that are clearly incompatible with the normal activity of certain locations at certain times. But <u>the city may not broadly prohibit reasonably amplified speech merely because of an undifferentiated fear that disruption might sometimes result</u>. When First Amendment freedoms are involved, the city may protect its legitimate interests only with precision.
>
> <u>Reeves</u>, 631 F.2d at 388 (Emphasis supplied). Music, be it singing, from the radio, played on a phonograph, etc., falls within these protected freedoms. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 L. Ed. 2d 671, 101 S. Ct. 2176 (1981).

*State v. Garren*, 117 N.C. App. 393, 396, 451 S.E.2d 315, 317-318, (1994).

33.     In finding a municipal loudspeaker ordinance overly broad and thus,

---

[5] *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); *Nurre v. Whitehead*, 580 F.3d 1087, 1093 (9th Cir. 2009).
[6] *See, e.g. Lamont v. Postmaster General*, 381 U.S. 301 (1965); *Board of Education v. Pico*, 457 U.S. 853 (1982).

unconstitutional, the United States Supreme Court said:

> Must he prove to the satisfaction of that official that his noise will not be annoying to people?
>
> The present ordinance would be a dangerous weapon if it were allowed to get a hold on our public life. Noise can be regulated by regulating decibels. The hours and place of public discussion can be controlled. But to allow the police to bar the use of loud-speakers because their use can be abused is like barring radio receivers because they too make a noise. The police need not be given the power to deny a man the use of his radio in order to protect a neighbor against sleepless nights. The same is true here.
>
> Any abuses which loud-speakers create can be controlled by narrowly drawn statutes. When a city allows an official to ban them in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas. In this case a permit is denied because some persons were said to have found the sound annoying. In the next one a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound. The power of censorship inherent in this type of ordinance reveals its vice.
>
> Courts must balance the various community interests in passing on the constitutionality of local regulations of the character involved here. But in that process they should be mindful to keep the freedoms of the First Amendment in a preferred position. *See Marsh v. Alabama*, 326 U.S. 501, 509.

*Saia v. New York*, 334 U.S. 558, 562, 68 S. Ct. 1148, 1150-1151, 92 L. Ed. 1574, 1578, (1948).

### Former City-Wide Amplified Entertainment Permitting Scheme
### Raleigh City Code §§ 12-2117 – 12-2124

34.     Defendant's amplified entertainment permit scheme was part of a city-wide overlay to the general ordinance imposing an overly broad, vague, content-based regulatory system requiring an AEP permit when an establishment in COR provides "amplified music or other amplified entertainment" unless the

establishment is within a hospitality district or if the amplified music and entertainment arises from religious or school activities. RCC § 12-2117 (repealed). AEP permits were obtained through COR's Chief Financial Officer through an application, fee payment and inspections process. RCC § 12-2122 (repealed). Failure to obtain an AEP or violation of the AEP ordinances can purportedly result in civil, criminal, and injunctive penalties and actions. RCC § 12-2124.

35. The AEP scheme defined "amplified entertainment" based on its content and purpose as:

> [A]ny type of music or other entertainment delivered through and by an electronic system. Televisions operating with no amplification other than their internal speakers and background music systems operated at a *low volume* and not intended for entertainment *shall* not be deemed amplified entertainment. (emphasis in original).

36. The AEP scheme vaguely defined "background music or sound" as:

> [A]mplified music or amplified sound that cannot be heard or felt outside the structure in which it is played except for brief periods when customers enter or exit the establishment and that is played within the structure at *low volume*. (emphasis in original).

37. Additionally, the AEP scheme vaguely defined "low volume" subjectively as:

> [S]ound played at a level such that *a person speaking in a normal tone of voice can be heard clearly* over this sound by another person standing thirty-six inches (36") away. (emphasis added).

RCC § 12-2118 (repealed).

38. In addition to the decibel levels set in the general noise ordinance (RCC § 12-5003), the AEP scheme purported to restrict bass frequency emission levels transmitted across an adjoining property line. RCC § 12-2119 (repealed).

Upon information and belief, this additional restriction was targeted at music made popular by the African-American and other minority communities (i.e. rap and hip hop).

39.     All businesses not holding an AEP or HDEP permit were permitted to play music or other sounds through outdoor speakers and open windows anytime day or night, provided they remained in compliance with the citywide decibel limits listed in RCC § 12-5003. All AEP/HDEP permittees were also required to remain in compliance with the citywide decibel limits listed in RCC § 12-5003; however, under the City's ordinances, AEP/HDEP permittees incurred additional restrictions to exercise their right of free expression in the form of music performed or played for entertainment purposes.

40.     Under the purported auspices of regulating sound and noise related to amplified entertainment, the former Code required permittees to provide a certain number of off-street parking spaces with minimum amounts of lighting and to clear any litter away from those spaces and permittee property adjacent to public rights of way by "7:30 a.m. each morning" [sic]. RCC § 12-2119(d).

41.     The AEP scheme also compelled permittees to employ at least one uniformed sworn law enforcement officer and one uniformed security guard furnished by a company licensed by the State to provide security, who must be present from 9:00 p.m. until one hour after closing to provide security and supervision if the City Manager's "system" determines that the establishment fails to meet the safety requirements. Id.

42. The AEP scheme required that all amplified entertainment must originate within a permittee's business and may not be conveyed outside the structure "by any means" including via loudspeakers, open windows, open doors (unless opened for entrance or exit) unless the permittee applies for and receives a special use permit called an Outdoor Amplified Entertainment Permit ("OAEP") or holds an HDEP. RCC § 12-2120 (repealed).

43. The AEP scheme purported to give the City Manager unfettered discretion to grant or deny special use permits for outdoor amplified entertainment. RCC § 12-2120(a)(1) (repealed). Under the AEP scheme, the City Manager or her designee had unfettered discretion to impose conditions and safeguards in issuing the special use permit "that will lessen negative impacts likely to occur from the outdoor amplified entertainment at the event." RCC § 12-2120(a)(1)(h) (repealed).

44. Penalties for violations of the AEP scheme ranged from $500 for the first offense to a one-year suspension of the permit for a fourth offense in any twelve-month period. RCC § 12-2124(a) (repealed). Permittees could appeal their first through third violations (but, perhaps, not the fourth) within 15 days of notice of violation. RCC § 12-2124(c).

45. The AEP scheme also indicated that in addition to civil penalties and permit suspension, a violation is a misdemeanor and could be enforced through injunctive and other equitable relief or combination of remedies. RCC § 12-2125.

46. The AEP regulatory scheme was discriminatory on its face because it

required a permit if one's business uses amplified sound for entertainment purposes, but not for religious, scholastic, governmental, or background purposes.

47. Subject to some exemptions not generally applicable to Plaintiffs, AEP permit holders were prohibited from emitting amplified sound entertainment from speakers placed outside the structure of their business (or open windows or doors) unless they also obtained from the City Manager a special use permit. RCC § 12-2120 (repealed).

48. The outdoor AEP applicant had to meet eight conditions set forth in the ordinance to obtain a special use permit, and the City Manager had unfettered discretion to further condition or "safeguard" a special use permit "that will lessen the negative impacts likely to occur from the outdoor amplified entertainment at the event." RCC § 12-2120 (a)(1) (repealed).

49. In sum, the AEP scheme required a permit for the conveyance of sound for entertainment (but not religious, scholastic, governmental or background) purposes via amplification through an electronic system anywhere in the city. Outdoor speakers emanating amplified entertainment anywhere in the city were prohibited unless the AEP holder obtains an additional special use permit via the City Manager who had unfettered discretion in deciding whether to issue the permit and, if issued, whether to impose further conditions that were not specified or meaningfully limited in the ordinance.

50. Plaintiffs requested a list of all AEP, OAEP and HDEP permit holders through the City's Office of Emergency Management, Special Events and

Hospitality which is the office responsible for regulation of all AEP and HDEP permits and permit holders.

51.     On 2 August 2021, Mr. Lovenheim, sent an email to Rachael Bain and Defendant Whitney Leigh Schoenfeld, managers at the Office of Emergency Management, Special Events and Hospitality (which is overseen by the City Manager). Mr. Lovenheim requested "a complete list of all current AEP (and OAEP) and HDEP permit holders in the City of Raleigh." Ms. Bain responded that same day saying that she "does not have access to pull any records or reports regarding AEP's or HDEP's (or any permits/licenses)." That is, the office responsible for the oversight and regulation of all AEP/HDEP permit holders claimed it did not have access to any information regarding those permits or permit holders.

52.     On 4 August 2021, Plaintiffs' counsel, pursuant to North Carolina's Public Records Law, requested a list of all current AEP, OAEP and HDEP permit holders from the City Manager. This request has not been fulfilled in any meaningful way by COR.

53.     Upon information and belief, there were approximately ten AEP permits throughout COR, all of which are for businesses operating in an area around Fayetteville Street in downtown Raleigh.

54.     Plaintiffs are informed and believe that there are likely thousands of businesses within COR that were subject to this regulatory scheme and should have had AEP permits by COR's own ordinance definitions, but most were not

compelled to obtain AEP permits.

55.    Plaintiffs are further informed and believe that there were no OAEP permits active in COR. That meant that any business outside of the designated Glenwood South Hospitality District (as more fully described below) was not permitted to emit amplified entertainment outside of its structure through speakers, open windows, or otherwise at any time day or night; nevertheless, many did.

56.    Plaintiffs are also informed and believe that fewer than 30 businesses held active HDEP permits throughout the Glenwood South Hospitality District despite the fact that there were approximately 60 businesses in the hospitality district who were required by the ordinances to have an HDEP permit (outdoor speakers, open windows, etc.). Therefore, Plaintiffs are further informed and believe that COR and its personnel were selectively enforcing its ordinances to the determent of Plaintiffs and other HDEP permittees without justification.

57.    Plaintiffs are further informed and believe that businesses in which plaintiff Mr. Lovenheim had an interest held approximately 20% of all AEP and HDEP permits issued in COR. Mr. Lovenheim owns nearly two dozen businesses, many of them located in downtown Raleigh, in the Glenwood South Entertainment District.

58.    Plaintiffs estimate that Mr. Lovenheim has an ownership interest in less than 0.1% of all businesses that were required under COR's AEP/HDEP regulatory scheme to have an AEP or HDEP permit throughout COR.

59.     On or about 7 October 2014, defendant City of Raleigh enacted Ordinance No. 2014-349:

> TO PERMIT THE CREATION OF HOSPITALITY DISTRICTS, TO ESTABLISH REGULATIONS FOR AMPLIFIED ENTERTAINMENT IN HOSPITALITY DISTRICTS, TO MODIFY CERTAIN NOISE REGULATIONS THAT APPLY THROUGHOUT THE CITY, AND TO CLARIFY CERTAIN PROVISIONS OF THE CITY'S AMPLIFIED ENTERTAINMENT REGULATIONS.

City of Raleigh Ordinance 2014-349, a true and accurate copy of which is attached as **Exhibit 5**.

60.     COR's HDEP regulatory scheme was an overlay to COR-wide general noise ordinance and city-wide AEP schemes imposed in a hospitality district.

61.     The only hospitality district designated by the Raleigh City Council was known as the Glenwood South Hospitality District. A true and accurate copy of the designation ordinance is attached as **Exhibit 7**.

62.     As depicted in the map attached to **Exhibit 7**, the Glenwood South Hospitality District effectively was bounded by Peace Street to the north; portions of N. Boylan Avenue to the west; a small portion of Hillsborough Street to the south; and portions of Harrington and N. West Street to the east. The area comprised slightly less than one (1) square mile. Mr. Lovenheim was one of the two citizens Raleigh City Council appointed to the committee which was tasked with the creation of the Glenwood South Hospitality District, and Mr. Lovenheim actually drew the original boundaries of the Hospitality District which COR then

accepted and approved.

63. Under the HDEP scheme, establishments located in the Hospitality District providing only "background" music or sound were not required to have an HDEP permit. However, establishments within the District providing or permitting any other type of "amplified entertainment" were required to have a permit. RCC § 12-2127 (repealed).

64. Pursuant to the HDEP scheme, applicants and permittees had to provide COR with the name, telephone numbers and email addresses for the operation of the establishment including its manager, which COR shall publish in a manner available to the public. RCC § 12-2129 (repealed).

65. Each new HDEP applicant had to provide COR's chief financial officer "or his designee" with:

    a.    The name of the business owner;

    b.    The name of the permittee's manager;

    c.    The name of the registered agent for service of process; and

    d.    "Such other information that the chief financial officer or his designee *may* deem relevant and appropriate." RCC § 12-2128(b) (repealed) (emphasis added.)

66. HDEP applicants had to obtain verification by the Inspections Department and Fire Department that unspecified "all relevant code and safety to life requirements have been met" before the HDEP permit would be issued. RCC § 12-2128 (repealed).

67.     HDEP permittees were permitted to provide amplified entertainment both inside and outside their structures compliant with the applicable sound level restrictions until 2:00 a.m. on Friday and Saturday nights versus the 11:00 p.m. cut-off in the general sound ordinance and AEP schemes.

68.     Under the HDEP regulatory scheme, permit holders were compelled to interact with public complainants as the ordinance requires that

> HDEP permittees "*shall* make the *manager* available to interact with *residents* and with *non-resident neighbors* concerning the establishment's operations whenever the establishment is open, occupied, or employees are on site. *Residents* or *non-resident neighbors may* utilize the public contact information made available by the *City* to contact the *manager* directly if any *amplified entertainment* is causing a disturbance. Repeated failure of the *manager* to speak with or otherwise respond to *residents* or *non-resident neighbors* within a reasonable time after a phone call that occurs when the establishment is open, occupied, or when employees are on site *shall* constitute a violation of this section. For purposes of this subsection, a failure is repeated when it occurs on three (3) or more days in any calendar month.

RCC § 12-2129(g) (repealed) (emphasis in original).

69.     Permit holders were "encouraged" to participate in mediation with those complaining and "willingness to participate in mediation on the part of the permittee is a requirement of issuance of an HDEP." RCC § 12-2129(h) (repealed). However, the ordinance did not require complainants to participate in mediation.

70.     The scheme to compel speech and public participation unilaterally from HDEP permittees in exchange for limited rights to engage in activities protected by the state and federal constitutions were unconstitutional.

71.     COR's AEP/HDEP application document was 18 pages long.

72. The application included a "Technical Bulletin" which required applicants spend thousands of dollars to install a "shunt trip actuator" (a big red button similar to gas shut-off buttons at gas stations) that is constantly attended for the purposes of shutting off all amplified sound equipment at the location – including any public address and microphone system – in case of an emergency. That is, instead of being able to use amplified sound equipment to give direction and guidance to those present regarding how to respond and act in the event of an emergency, the device rendered all such equipment inoperative, permitting only unamplified yelling to guide patrons and staff to safety.

73. The stated authority for requiring the installation of this device was North Carolina Fire Prevention Code Section 901.4.3 which states:

> Where buildings, or portions thereof, are divided into fire areas so as not to exceed the limits established for requiring a fire protection system in accordance with this chapter, such fire areas shall be separated by fire barriers constructed in accordance with Section 707 of the International Building Code or horizontal assemblies constructed in accordance with Section 711 of the International Building Code, or both, having a fire-resistance rating of not less than that determined in accordance with Section 508.4 of the International Building Code.

74. COR's opportunistic imposition of ineffective electrical and operational modifications to Plaintiffs' operations based on a nonsensical reference to the state building code is not constitutionally defensible.

## Creation of The Village.

75. In 2016, plaintiff Glenpeace LLC received approved site and building plans from COR for 616 Glenwood Avenue (formerly "Harry's Guitar Shop") to

change its use from mercantile to assembly.

76.     On 3 May 2019, plaintiff Glenpeace LLC received approved building plans from COR for 517 W. Peace St for renovating the existing assembly indoor and outdoor space.

77.     On 29 May 2019, plaintiff Glenpeace LLC received approved site and building plans from COR for 513 W. Peace St for renovating and expanding the existing indoor assembly space as well as building expanding the outdoor assembly space.

78.     The construction at 513 W. Peace St was finished by 1 March 2020 and a certificate of occupancy was issued.

79.     The construction at 517 W. Peace St was finished by 1 March 2020 and a certificate of occupancy was issued.

80.     The construction at 616 Glenwood Avenue was not completed due to Covid delays and an ongoing dispute with the landlord. The building is used for mercantile and storage.

81.     On 6 March 2020, plaintiff Glenpeace LLC d/b/a "The Village" received its temporary Alcoholic Beverage Control ("ABC") permits from the North Carolina ABC Commission for beer, fortified wine, unfortified wine, mixed beverage private bar).

82.     Plaintiff Glenpeace LLC's ABC licensed premises includes the full properties of 513 W. Peace St, 517 W. Peace St, and 616 Glenwood Avenue including all buildings and outdoor areas.

83.     Plaintiff Glenpeace LLC's physical mailing address for permits and licensure is 513 W. Peace St and its public marketing address is 616 Glenwood Avenue.

84.     Plaintiff Glenpeace LLC opened The Village for the first time on Thursday 12 March 2020 and was open for only one Weekend. The Village was closed that Sunday and Monday in order to prepare for St Patrick's Day – the biggest bar day of the year.

85.     The Village was scheduled to open at noon on Tuesday 17 March 2020, however Governor Cooper's Executive Order No. 118 prohibiting the operation of "Bars" came into effect that day causing The Village to be closed for the next six months.

86.     On 30 September 2020 Governor Cooper issued Executive Order No. 169 permitting the reopening of "bars" at thirty-percent (30%) of their exterior occupancy only with no interior occupants allowed.

87.     On 29 October 2020, The Village was issued occupancy capacities from COR's Building Department and Occupancy Certificates for the three properties comprising its licensed premises at 513 W. Peace Street, 517 W. Peace Street, and 616 Glenwood Avenue.

88.     Also on 29 October 2020, The Village was issued occupancy capacities and an occupancy certificate for 507 W. Peace St as an approved extension of premises for The Village.

89.     Approval from COR was granted, and NC ABC was also notified as

required. NC ABC performed several subsequent inspections of The Village's four permitted parcels without any citations, violations or issues.

90. All occupancy certificates were accessed and printed from https://covid19.ncdhhs.gov/maxoccupancysign-eng-color-0/open on the NC DHHS website

91. On 30 October 2020, The Village opened at 30% exterior occupancy with the required seating as all customers needed to remain seated by Executive Order.

92. During the time The Village was open over the next six weeks, the COR Fire Marshal and individuals from the COR Office of Hospitality and Special Events performed weekly inspections at its location. Sometimes The Village received a summary of the inspection, sometimes not. There were never any life safety issues, building issues or zoning issues reported during these frequent inspections.

93. On 9 December 2020, The Village closed as a safety precaution due to COVID's Delta variant and the oncoming winter.

94. On 24 February 2021, Governor Cooper issued Executive Order No. 195 allowing for "Bars" to reopen at thirty-percent (30%) interior and exterior occupancies.

95. The Village re-opened on 5 March 2021 with thirty-percent (30%) interior and exterior occupancy levels.

96. On 23 March 2021, Governor Cooper issued Executive Order No. 204

allowing "bars" to expand to fifty-percent (50%) interior and exterior occupancy levels.

97. On 26 March 2021, The Village received its fifty-percent (50%) occupancy capacities and updated occupancy certificates (totaling 632 people) from COR's Development Services through was then called the Office of Emergency Management, Special Events and Hospitality, which is part of COR Manager's Office. Upon information and belief, that office now referred to as the Office of Special Events and Hospitality and sometimes, the Office of Special Events.

98. In order to be able to expand capacity, "Bars" were required to have their guests remain seated. Thus, The Village was required to have seating (tables, chairs, couches, etc.) for 632 people.

99. All four properties which comprised The Village, including all outdoor areas, were frequently inspected throughout 2020 and 2021 by different COR departments and personnel including the Building Department, Fire Department, Zoning Department and the Office of Emergency Management, Special Events and Hospitality.

100. On 31 March 2021, Glenpeace LLC received its permanent ABC license to sell alcohol on its licensed premises at The Village consisting of 513 W. Peace Street, 517 W. Peace Street, and 616 Glenwood Avenue. Due to Covid extension regulations, The Village continued with an extension of premises into the parking lot of 507 W. Peace Street during that time.

101. On 5 April 2021, Rachael Bain from the Office of Emergency

Management, Special Events and Hospitality reached out to The Village requiring The Village to apply for an AEP/HDEP sound regulation permit (a permit created by COR and exclusively used in COR). For many reasons, The Village strongly disagreed that an HDEP permit was required. However, it eventually decided to allow one to be issued in an attempt to avoid further problems.

102.    On 28 April 2021, the first noise citation 0021029 was issued to The Village.

103.    On 1 May 2021, the second noise citation 0031027 was issued to The Village.

104.    On 1 May 2021, a third noise citation 0031028 was  issued to The Village.

105.    The first three civil citations were issued under the standard noise ordinance, not the HDEP noise ordinance.

106.    The Village remained under reduced COVID occupancy restrictions during this time.

107.    On 14 May 2021, Governor Cooper issued Executive Order No. 215 lifting all COVID restrictions including occupancy restrictions.

108.    On 17 May 2021, COR issued The Village its post-COVID occupancies capacities and occupancy certificates for 513 W. Peace Street, 517 W. Peace Street, and 616 Glenwood Avenue.

109.    On 19 May 2021, a memorandum and report were requested by Raleigh City Council which was compiled by COR Manager's office, COR Attorney's

Office and The Raleigh Police Department titled 'Council Response – The Nightlife Village Complex'.

110. This memorandum detailed many aspects of The Village and the noise issues were spoken about extensively at that months City Council meeting with City Council members, COR Attorney and RPD present. The memorandum states that The Village's occupancy is "approximately 1,260 persons." In addition, structures such as a DJ booth are referenced without any mention of impropriety. There were no Zoning or Building issues brought up or discussed, only noise and noise related issues.

111. On 8 September 2021, Mr. Lovenheim and The Village were issued HDEP citation 0032 from RPD for an alleged noise violation on 13 August 2021. A timely appeal was filed.

112. Also on 8 September 2021, Mr. Lovenheim and The Village were issued HDEP citation 0033 from RPD for another alleged noise violation on 13 August 2021. A timely appeal was filed.

113. On 24 September 2020, Mr. Lovenheim organized an email campaign to bring awareness to the Raleigh City Council about the noise related issues on Glenwood South. For two days, from Friday evening 24 September 2021 until Sunday evening 26 September 2021, Mr. Lovenheim, his staff, and patrons sent emails to City Council at their formal city email addresses. Those who chose to send emails could opt to send a personalized email or use a form provided. Roughly 2,500 emails from separate individuals were sent over the course of 48 hours.

114. On 7 October 2021, Mr. Lovenheim and The Village received, through counsel, a letter from Paul Gessner, an attorney representing COR. Mr. Gessler demanded that counsel inform Mr. Lovenheim that it was inappropriate for he, his staff, or his patrons to communicate with the defendant Marchell Adams-David or City Council moving forward. On behalf of COR, Mr. Gessner conveyed that Mr. Lovenheim, his staff, and his patrons' constitutional right to petition their government for redress of grievances had been revoked because The Raleigh City Council was in the position to potentially hear an appeal to a civil noise citation issued to The Village.

115. On 8 October 2021, Mr. Lovenheim and The Village responded to Mr. Gessner's email through counsel.

116. At the beginning of October, Mr. Lovenheim was contacted by COR Building, Fire, and Zoning inspectors due to complaints about noise coming from tents, installed during COVID, at several of his businesses on Glenwood South including The Village.

117. Mr. Lovenheim met with COR's Building, Fire, and Zoning inspectors at The Village several times throughout October and November 2021. During each of their visits, no safety issues or other issues were brought up or identified except for the presence of tents.

118. COR's Building and Fire inspectors both relayed after several visits and discussions that the tents did not need to be permitted by either of their departments as the tents were a temporary structure and under the triggering size

which might require permitting.

119.    COR's Zoning inspector was initially unsure as to whether the tents would need a zoning permit however eventually stated that "'this decision is coming from above" when relaying that the tents would eventually need to be permitted by Zoning.

120.    Mr. Lovenheim pointed out to inspectors that there were tents at businesses on the same block which did not receive violations, yet all his businesses were being cited for tent violations. Mr. Lovenheim also shared pictures of similar tents at 10 nearby addresses which were all within a close distance and many located on the six blocks of Glenwood South.

121.    On 28 October 2021, COR dismissed Civil Citations 31027, 30128, 31029.

122.    On 29 October 2021, Mr. Lovenheim and The Village were issued HDEP citation 0034 from RPD for an alleged noise violation on 17 October 2021. A timely appeal was filed.

123.    The same day, a uniformed Defendant Capt. Robert Patrick Bowen climbed a ladder at another business adjacent to The Village despite the fact that he had never been denied entry to The Village. He appeared to stand on a walk-in cooler to survey The Village.

124.    Mr. Lovenheim sent a message to COR's Mayor concerned about Defendant Capt. Robert Patrick Bowen's conduct and that he appeared to be standing upon The Village's walk-in cooler without permission.

125. The next day, Mr. Lovenheim received a text from RPD Chief Estella Patterson asking if he could meet with her. At her request, Mr. Lovenheim went to the RPD's Cabarrus station at 9:00 p.m. Mr. Lovenheim was taken to a conference room where the Chief, Deputy Chief and several other uniformed, armed officers were present. The Chief informed Mr. Lovenheim that Defendant Capt. Robert Patrick Bowen was acting under her authority and that she "knew" that he was not on The Village's property and that he needed to contact the Mayor and let her know that.

126. On 19 November 2021, Mr. Lovenheim met with COR Zoning Supervisor Tige Phyfer and Defendant Whitney Leigh Schoenfeld to discuss the tents and how COR wanted to proceed in addressing them. Despite being scheduled for a Building code discussion, Mr. Phyfer and Defendant Whitney Leigh Schoenfeld told Mr. Lovenheim the meeting was really "all about the noise." Mr. Lovenheim was also told that COR and Defendant Robin Lea Tatum want the tents gone because they are "too loud."

127. At the end of the meeting with Tige Phifer and Whitney Schoenfeld, Mr. Lovenheim and The Village were issued HDEP citation 0035 from RPD for an alleged noise violation on 13 August 2021. A timely appeal was filed.

128. On 21 December 2021, The Village received a violation notice for one of the tents located on its property but no other notice of violation or indication of noncompliance for any other tent or structure. Two of Mr. Lovenheim's other businesses on the same block received violations for tents the same day. Upon

information and belief, no other businesses in downtown Raleigh except for the businesses on the 600 block of Glenwood have received tent violations.

129.    During the first week of January 2022 the tent at The Village referenced in the violation was removed. Mr. Phyfer emailed the property owner on 13 January 2022 to let him know the violation had been corrected and the zoning case had been closed. No other potential zoning violations were identified or discussed during that time.

130.    In April 2022, Davis Brooks Chief Code Compliance Officer for COR was brought in to assess the situation at the Village. Mr. Lovenheim met with Mr. Brooks onsite and by phone several times and apprised him of the situation at The Village as well as the upcoming building plan submissions for all four properties.

131.    Mr. Brooks issued a detailed report to the COR which The Village and Mr. Lovenheim have requested but have not received.

132.    Also in April 2022, Defendant Capt. Robert Patrick Bowen confronted Alchemy's manager asserting that the attire of two servers at Alchemy mandated that they needed adult entertainment permits while he stared them down and made them very upset. They were wearing dance leotards.

133.    On 29 April 2022, new building plans BLDNR-023241-2022 were submitted to COR for 616 Glenwood Avenue under the existing approved site plan for a change of use to A2 assembly.

134.    On 4 May 2022, Mr. Lovenheim and The Village were issued HDEP citation 0039 for an alleged noise violation on 2 April 2022. A timely appeal was

filed.

135.   Also on 4 May 2022, Mr. Lovenheim and The Village were issued HDEP citation 0040 for an alleged noise violation on 2 April 2022. A timely appeal was filed.

136.   The plan review for 616 Glenwood was completed by COR on 26 May 2022 and one of the comments from Zoning was that the existing site plan had sunset. At the request of COR, The Village waited to address the site plan submission. All other comments were able to be addressed for resubmission.

137.   The Village put its revised building plans for resubmission for 616 Glenwood Avenue in a "'holding pattern" at the request of COR to allow COR and Mr. Lovenheim to meet to go over a "global resolution to a number of issues." Mr. Lovenheim was told that once instructed by COR, The Village could re-submit full Tier 1 building and site drawings for 616 Glenwood within several weeks.

138.   On 19 May 2022 building plans BLDNR 026902-2022 were submitted for 517 W. Peace Street for expansion of the bathroom facilities.

139.   The plan review for 517 W. Peace Street was completed on 5 June 2022 with the only comment for the review from all trades being a single question about the existing electrical box which was easily answered. At the request of COR, The Village waited to address the site plan submission.

140.   The Village put its revised building plans for 517 W. Peace Street for resubmission in a "holding pattern" at the request of COR until COR and Mr. Lovenheim could meet to go over a "global resolution to a number of issues." As

with 616 Glenwood, Mr. Lovenheim was told that once instructed by COR, The Village could re-submit full Tier 1 building and site drawings for 517 W. Peace St within several weeks.

141. On 20 May 2022, building plans BLDNR 027284-2022 were submitted for 513 W. Peace Street for expansion of the bathroom facilities.

142. The plan review for 513 W. Peace Street was completed on 6 June 2022. One of the comments from Zoning concerned outside seating expansion. At the request of COR, The Village waited to address the site plan submission. All other comments were able to be addressed for resubmission.

143. As with 616 Glenwood and 517 W. Peace, The Village put its revised building plans for 513 W. Peace Street for resubmission in a 'holding pattern' at the request of COR until COR and Mr. Lovenheim could meet to go over a "global resolution to a number of issues." As with the others, Mr. Lovenheim was told that once instructed by COR, The Village could re-submit full Tier 1 building and site drawings for 513 W. Peace Street within several weeks.

144. The first week of July 2022, building plans were submitted for 507 W. Peace St for expansion of the bathroom facilities.

145. The submission was withdrawn at the request of COR until the forecasted meeting with Mr. Lovenheim.

146. Thus, The Village put its ready building plans for resubmission for 507 W. Peace Street in a 'holding pattern' at the request of COR until COR and Mr. Lovenheim could meet to go over a "global resolution to a number of issues."

Mr. Lovenheim was again told that once instructed by COR, The Village could re-submit full Tier 1 building and site drawings for 507 W. Peace Street within several weeks.

147. On 28 May 2022 a walkthrough of The Village was set up with Mr. Lovenheim, Mr. Lovenheim's counsel, Deputy City Attorney Dottie Kibler, RPD and others to look at The Village sound levels and property at night and in operation. The full walkthrough took about an hour.

148. On 2 June 2022, Mr. Lovenheim and The Village received a noise proposal agreement from defendant Robin Lea Tatum City Attorney which advised the parties "work towards a collaborative non-adversarial relationship" during this period. Although the proposal itself was specifically in reference to noise violations, Mr. Lovenheim took the sentiment of non-adversarial goodwill to extend to all areas of discussion of issues with COR.

149. During this time period, Mr. Lovenheim, through his counsel, advised defendant Robin Lea Tatum several times that he would be in Rochester, New York, the week of 5-12 June 2022 due to the expected passing of his father who had been gravely ill for some time. Because of this, a second scheduled walkthrough of The Village with Deputy City Attorney Dottie Kibler and RPD attorney Sherita Walton was postponed until the week of 13 June 2022.

150. On 6 June 2022, COR issued three the Building Code Violations to Mr. Lovenheim while he was in Rochester, New York. The Village and corresponding property owners at 513 W. Peace Street, 517 W. Peace Street, and

616 Glenwood Avenue also received these notifications of violations.

151. On 7 June 2022, Mr. Lovenheim's father passed away in Rochester, New York.

152. On 8 June 2022, Mr. Lovenheim contacted Bryan Robinson the Chief Building Official for COR to schedule a meeting to confirm what needed to be submitted to Development Services to come into compliance.

153. After scheduling the meeting, Mr. Robinson emailed Mr. Lovenheim back on 9 June 2022 explaining that since there will be multiple departments involved, defendant Robin Lea Tatum wanted to coordinate the meeting with all Departments.

154. For the next six weeks, neither The Village nor Mr. Lovenheim were contacted by defendant Robin Lea Tatum to schedule a meeting date.

155. Also on 9 June 2022, COR issued multiple Zoning violations to Mr. Lovenheim, The Village, and its corresponding property owners which were appealed to the COR Board of Adjustment. These notices were sent despite confirmation by COR on 13 January 2022 that The Village did not have any Zoning violations.

156. On 11 June 2022, Mr. Lovenheim's father's funeral was held in Rochester, New York.

157. Once Mr. Lovenheim returned to Raleigh from Rochester, he had only three days to file the initial Notice of Appeal for the building violations issued by COR on 6 June 2022. The initial response to the North Carolina Department of

Insurance was brief because a lot of information needed to be compiled for the appeal.

158.    On 17 June 2022, a second walkthrough of The Village was scheduled with Mr. Lovenheim, Mr. Lovenheim's counsel, Deputy City Attorney Dottie Kibler, Police Attorney Sherita Walton, Defendant Capt. Robert Patrick Bowen, other RPD officers at The Village. The walkthrough started at 9 p.m. and lasted about an hour and a half.

159.    As described in greater detail below, COR issued multiple notice of violation for "life safety," building and zoning violations to The Village and soon thereafter posted novel "unsafe building" placards at The Village. Those notices were timely appealed.

160.    In response to The Village's appeal of alleged Building Code violations to the Department of Insurance, Defendant Robin Lea Tatum submitted a document on behalf of COR which contained multiple misrepresentations of fact regarding The Village's compliance with building, zoning, and fire code regulations. Upon information and belief, those misrepresentations were made knowingly as a means to escalate the exigency of the circumstances to again force Mr. Lovenheim and The Village to do what Defendants demanded regarding noise.

161.    Similarly, during roughly the same time period, Mr. Lovenheim and Alchemy began receiving Notices of Violation for purported Building and Zoning Code Violations which were appealed.

**Selective Enforcement of AEP and HDEP Permitting.**

162.    Plaintiffs are informed and believe that there were about 30 HDEP permittees listed on COR's hospitality district map prior to the repeal of the AEP/HDEP regulatory scheme. *See* https://maps.raleighnc.gov/hospitality/#/

163.    Plaintiffs are further informed and believe that there were approximately 30 bars, restaurants and other hospitality business operations located within the Glenwood South Hospitality District which did not obtain HDEP permits, but who used amplified entertainment within and outside their operating structures without being required to obtain an HDEP.

164.    Further, Plaintiffs are informed and believe that there were hundreds of bars, restaurants and other hospitality business operations located within COR without AEP permits that deploy amplified entertainment within and outside their operating structures without being required to obtain an AEP or special use permit for outdoor amplified entertainment.

165.    COR's selective and arbitrary enforcement of its noise and amplified entertainment regulatory schemes was constitutionally indefensible.

**Post-COVID-19 Shutdown Enforcement**

166.    Beginning with the onset of the pandemic in March 2020, the State of North Carolina and, in turn, COR imposed onerous restrictions, (in the case of "private bars," a complete prohibition on their operation), on private bars, restaurants and other ABC permittees throughout COR and, in particular, in the Glenwood South Hospitality District.

167. Plaintiffs and others challenged the type and manner of impositions based on the North Carolina Emergency Management Act in Wake County Superior Court seeking compensation under same.[7] That case remains pending on appeal before the North Carolina Supreme Court.

168. As the restrictions began to lessen, Plaintiffs re-opened their operations, including their use of amplified sound.

169. In the interim, neighbors adjacent to the hospitality district apparently became accustomed to fewer people and less aggregate noise in the area.

170. On any given Friday or Saturday night, Plaintiffs are informed and believe that up to 20,000 people gather on Glenwood South. Traffic in the area has increased significantly to the point that COR started to block vehicular traffic on the 6 blocks of the Glenwood South Entertainment District in 2023.

171. There are dozens of bars and restaurants along the six blocks of Glenwood Avenue which is at the heart of the Glenwood South Entertainment District. The 600 block of Glenwood alone has five large bars: Cornerstone, Alchemy, Dogwood, Beer Garden and The Village which have combined occupancies of several thousand people.

172. The combined indoor and outdoor occupancies of those five operations on that one block is similar in magnitude to a typical concert held at Red Hat

---

[7] *N.C. Bar and Tavern Association et al. v. Roy Cooper*, Wake Co. Sup. Ct. File No. 20-CVS-6358

Amphitheatre in downtown Raleigh.

173. In 2021, a handful of residents in properties near the Hospitality District – including one who purchased a commercial structure and converted it into a residence began regularly complaining to COR about noise which they attribute, without justification, predominantly to The Village and some, but not all, of the other bars on the 600 block of Glenwood Avenue. Those residents called for others to join their complaints for the express purpose of shutting down The Village and several other businesses on Glenwood South.

174. Despite The Village making multiple attempts to negotiate a resolution and spending tens of thousands of dollars on sound engineers and mitigation efforts, RPD began issuing notices of violation to The Village.

175. The Raleigh Police issued a criminal citation to The Village's manager, Kenneth Briska on 13 August 2021 for purported criminal violation of COR's noise ordinance RCC § 12-2129(c). Despite COR's admitted failure to measure sound as required by its own ordinances or account for the sources of other sound present during measurement, this criminal citation remained pending for months.

176. On 21 August 2021 the Raleigh Police issued a second criminal citation to Mr. Briska for purported criminal violation of COR's noise ordinance pursuant to RCC § 12-2129(c). Despite COR's admitted failure to measure sound as required by its own ordinances or account for the sources of other sound present during measurement, this criminal citation remained pending for months.

177.    On 8 September 2021, the Raleigh Police issued civil HDEP Citation Nos. 32 and 33 to Mr. Lovenheim and The Village alleging civil violations of RCC § 12-2129(c) based on the 13 and 21 August 2021 criminal citations issued to Mr. Briska reflected above.

178.    On 16 September 2021, Mr. Lovenheim and The Village appealed these civil citations and requested to review the evidence that serves as the basis of the purported violation pursuant to RCC § 12-2124(c).

179.    On 7 October 2021, counsel for Defendant City Manager Marchell Adams-David sent Plaintiffs' counsel a letter demanding that The Village and Lovenheim – and their patrons – stop any direct communications with COR or COR Council in degradation of their First Amendment rights to petition their government for the redress of grievances.

180.    On 17 October 2021, the Raleigh Police issued a third criminal citation to Mr. Briska for purported criminal violation of COR's noise ordinance pursuant to RCC § 12-2129(c). Despite COR's admitted failure to measure sound as required by its own ordinances or account for the sources of other sound present during measurement, this criminal citation remained pending for months.

181.    After repeated requests to review the evidence purporting to support civil HDEP Citation Nos. 32 and 33, Mr. Lovenheim and his counsel were finally permitted to review – but were not permitted to have copies of – the documents and recordings that COR asserted served as the evidentiary basis for the issuances of these civil citations on 27 October 2022. COR gave no legal basis for its refusal

to provide copies of public records to Mr. Lovenheim and his counsel.

182. On 29 October 2021, the Raleigh Police issued civil HDEP Citation No. 34 to Mr. Lovenheim and The Village alleging violations of RCC § 12-2129(c) based on the 17 October 2021 criminal citation issued to Mr. Briska reflected above.

183. On 31 October 2021, the Raleigh Police issued a fourth criminal citation to another manager at The Village, John Thomas Zimmerman, for purported criminal violation of COR's noise ordinance pursuant to RCC § 12-2129(c). Despite COR's admitted failure to measure sound as required by its own ordinances or account for the sources of other sound present during measurement, this criminal citation remained pending for months.

184. When asked the basis for the tickets, Raleigh Police have responded "we've had complaints," but refused to identify the complainants, the times of the complaints, the sound readings taken, or any other justification for issuance of the notices of violation.

185. The operators of The Village have repeatedly pointed out that other operations on the very same block were emitting amplified sound louder than sound from The Village, but RPD ignored and did not act on this information. Upon information and belief, the RPD's failure to enforce COR's sound regulation scheme on others was because COR elected to selectively enforce it against Plaintiffs in retaliation for Plaintiffs' exercising their constitutional rights.

186. On 12 November 2021, Lovenheim and The Village appealed civil citation No. 34 and requested to review the evidence that serves as the basis of the

purported violation pursuant to RCC § 12-2124(c).

187. On 18 November 2021, the RPD issued civil HDEP Citation No. 35 to Lovenheim and The Village alleging violations of RCC § 12-2129(c) based on the 31 October 2021 criminal citation issued to Mr. Zimmerman reflected above.

188. On 30 November 2021, Mr. Lovenheim and The Village appealed civil citation No. 34 and requested to review the evidence that serves as the basis of the purported violation pursuant to RCC § 12-2124(c).

189. As agreed to by the parties, on 13 December 2021, Mr. Lovenheim and The Village supplemented their appeal of civil citation Nos. 32 and 33.

190. Despite the fact that nothing in its Code permits supplementation of evidence, on 16 December 2021, the Raleigh Police provided COR Manager with a document entitled "Supplemental Affidavit of Raleigh Senior Officer Philip Falco" in response to Mr. Lovenheim's and The Village's appeals. Mr. Lovenheim and The Village were not provided with a copy of Officer Falco's supplemental affidavit.

191. Mr. Lovenheim and The Village objected to COR Manager's consideration of the supplemental affidavit and asked that it be stricken from the record by letter dated 21 December 2021. No one responded to that request on behalf of COR.

192. As agreed to by the parties, on 21 January 2022, Mr. Lovenheim and The Village supplemented their appeal of civil citation Nos. 34 and 35 after multiple requests to review the evidence supporting the violations as required by the ordinance. As before, Mr. Lovenheim and The Village were told they could not

have copies of the documents and information provided for review and underlying these civil citations. COR gave no legal basis for their refusal to provide copies of public records to Mr. Lovenheim and his counsel.

193. That correspondence and other documents described the multitude of problems with Defendants' enforcement actions, conduct related thereto, and the underlying regulatory scheme.

194. On 15 February 2022, Tansy D. Hayward, COR's Deputy City Manager, wrote to counsel for Lovenheim and The Village to notify them and counsel for the Raleigh Police that she had been designated by defendant Adams-David to address Plaintiffs Lovenheim's and The Village's appeals and the process she intended to follow.

195. Mr. Lovenheim and The Village were concerned that the process described by Ms. Hayward did not provide for their rights to appeal her decisions to Raleigh City Council pursuant to RCC §12-2124(e). Counsel inquired how those rights would be addressed. After multiple inquiries, counsel received no substantive response. As these matters continued, Defendant Capt. Robert Patrick Bowen began and escalated a personal campaign to compel compliance with his interpretation of COR's sound regulatory scheme. Those efforts included:

   a. Multiple angry, threatening confrontations with Plaintiffs' personnel demanding compliance with his interpretation of the regulatory scheme despite his acknowledgment that it was antiquated and largely unenforceable;

b. Trespass onto Plaintiffs' property while in uniform and armed to yell at and intimidate Plaintiffs' personnel about the presence of outdoor speakers;

c. Threatening off-duty members of the Raleigh Police with write-ups and discipline if he found them working security in an off-duty capacity but not reporting noise violations despite their having no access to sound measurement equipment, training on said equipment, and despite his own acknowledgment that the sound measurement equipment owned by COR could not distinguish the origin of sound emanating from multiple sources in the Hospitality District;

d. Threatening Plaintiffs' personnel with violation of adult entertainment establishment laws not applicable to Plaintiffs' operations;

e. Initiating complaints with COR's zoning, building, fire and events departments when Plaintiffs did not voluntarily comply with his interpretation of the sound regulation scheme;

f. While Defendant Capt. Robert Patrick Bowen was out of uniform, relieving an off-duty Raleigh Police officer of off-duty work at The Village for an inconsequential clothing issue, causing a safety and security issue;

g. Submitting a disciplinary infraction against a different off-duty officer for parking his police vehicle near The Village while working off-duty security; and

h.    Upon information and belief, contacting at least one of plaintiff's landlord threatening unwarranted zoning violations against them in retaliation for Plaintiffs' not kowtowing to Defendant Capt. Robert Patrick Bowen's demands for compliance with his interpretation of the sound ordinances and permitting schemes.

196.   There was no meaningful, accurate or measurable way to distinguish between amplified sounds from The Village and (1) amplified sound from other businesses in the immediate area, such as Dogwood, Alchemy, Cornerstone, and the Raleigh Beer Garden; (2) unamplified sound from The Village and nearby businesses; or (3) amplified and unamplified sound from vehicular, pedestrian, or train traffic in the area.

197.   COR's arbitrary and selective enforcement against The Village and threatened enforcement against other operations with common ownership or management was unconstitutional.

198.   Plaintiffs are informed and believe that COR, through its Council, management and police department, committed to using its chaotic and convoluted noise and amplified entertainment regulatory scheme to shut down The Village and to intimidate other private bars – including those with common ownership or management with The Village and those owned by others – via selective enforcement, threatened enforcement, and targeted harassment.

199.   For example, on Saturday 2 April 2022, COR, through the Raleigh Police, issued a fifth (civil HDEP Citation No. 39) and sixth (civil HDEP Citation

No. 40) HDEP violations to Mr. Lovenheim and The Village.

200.    On Saturday 2 April 2022, COR, through the Raleigh Police, issued "First Offense" civil HDEP Citation (No. 41) to Mr. Lovenheim and The Avenue.

201.    Civil Citation No. 39 alleged that at approximately 12:20 a.m. on Saturday 2 April 2022 (Friday night), The Village's "exterior speakers were not at low volume, in violation of 12-21290(f)" and that there was "amplified sound conveyed outside the structure in violation of 12-2120."

202.    Civil Citation No. 40 alleged that at approximately 10:30 p.m. on Saturday 2 April 2022, The Village's "exterior speakers were not at low volume, in violation of 12-21290(f)" and that there was "amplified sound conveyed outside the structure in violation of 12-2120."

203.    Civil Citation No. 41 alleged that approximately 10:14 p.m. on Saturday 2 April 2022, The Avenue had "amplified sound [ ] conveyed outside the structure in violation of 12-21290."

204.    There was no §12-21290(f) in the Raleigh City Code. Moreover, RCC § 12-2120(a) began:

> Except as otherwise permitted in this division, all amplified sound must originate within the structure housing a business which holds an *amplified entertainment permit* or an *HDEP* and *shall not* be conveyed outside the structure by any means, including but not limited to exterior loudspeakers, open windows, open doors except entrance doors when opened as needed for ingress and egress, or any other means which conveys or facilitates amplified music being conveyed from inside the confines of the building to the outside of the building.

RCC § 12-2120(a) (underlined emphasis added; italicized emphasis in original).

205.    Setting aside the RCC's vague definition of low volume, at the time, RCC §§ 12-2129(e) and (f) permitted the activities for which Mr. Lovenheim, The Village, and The Avenue were purportedly cited in civil HDEP Citation Nos. 39-41.

206.    Upon information and belief, Plaintiffs were concerned that Defendants, and those acting in concert with them, would continue with their campaign to intimidate them and others into compliance with COR's unconstitutional regulation of activities protected by the First Amendment as the scheme was both written and enforced and Plaintiffs and others without meaningful due process to challenge the findings of COR Manager and her designee.

## Failed, Direct Enforcement of the Former General, City-Wide Noise Ordinance

207.    As is indicated above, before and after the global COVID-19 pandemic and the enactment of the Nightlife Permit Ordinance, COR enacted and sometimes enforced an amplified entertainment permitting regulatory scheme

208.    For many years prior to the pandemic, the enforcement of the HDEP scheme was largely through a COR operated website where individuals concerned with noise or other issues with HDEP permittees could log a complaint or avail themselves of information posted on the website to contact the permit holder.

209.    Around the time the Hospitality District was created, some of the owners of businesses that would be impacted informed COR through various

means including, at the invitation of the Mayor, the sharing of a draft lawsuit calling into question the constitutionality of COR's noise regulations.

210. After some discussions, the online portal was implemented, and enforcement was not of such a nature that caused the HDEP permittees to pursue a constitutional challenge. While there were ups and downs, everyone was able to get along.

211. COR's police department deployed a Hospitality District Squad who acted upon both complaints posted through COR's online portal or calls made to emergency and non-emergency numbers for the department.

212. From its creation until the onset of the pandemic, the Hospitality District flourished with more and more restaurants, bars, businesses, apartments, a hotel, and condominiums opening each year. Rents increased steadily and property values and tax revenues soared.

213. In fact, an economic impact study commissioned by the Glenwood South Neighborhood Collaborative which was released in August 2023 found Glenwood South's total annual economic impacts and benefits to the Wake County economy to be significant including:

a. $1.2 billion total impacts– combined economic impacts of resident and visitor expenditures.

b. $845 million retained local benefit – estimated benefits retained in the Wake County market.

c. $212.2 million total economic impacts from local Food and

Beverage sales.

d. 18,500 jobs – estimated job benefits to Wake County's full and part time employment.

e. $110 million indirect taxes – estimated indirect business tax impacts derived from resident, visitor, and commerce activities.

214. For both AEP and HDEP locations, enforcement activities largely amounted to a symbiotic relationship where COR's police kept the peace by working with permittees in the District to monitor the volume of their music while addressing individual complainant's concerns in the context of their decision to reside near an established entertainment district. Data from the portal confirmed that a handful of people were the one's complaining. In one year, the same person complained more than 80 times.

215. At the onset of the pandemic, Governor Cooper ordered all bars and restaurants closed for an extended period of time.

216. Dozens of AEP and HDEP permit holders were forced to go dark overnight. Their owners and hundreds of their employees were rendered unemployed and unable to make a living.

217. Over an extended period of time, the Governor loosened his restrictions on many types of bars and restaurants, but those operating as private bars under the ABC Commission's regulatory scheme were deemed unworthy of the same trust to reopen in restricted fashion as was given to the eight other types of bars in North Carolina.

218. Thus, COR's Glenwood South remained mostly dark and silent even when other bars were permitted to reopen in increasing capacities. Private bars in Raleigh and across the state did not survive the mandated closures or unviable restrictions. When private bars were ultimately permitted to reopen in a viable but restricted capacity, most activity was forced to be outdoors.

219. COR issued "outdoor occupancy" permits to most of the private bars in the hospitality district including to Plaintiffs.

220. As the Governor loosened restrictions on private bars, more patrons could return – outside.

221. As vibrancy returned, so did volume, crowded traffic, and activity.

222. Instead of returning to COR's portal process to address complaints, a small but vocal group of longtime residents in the area began a crusade to eliminate nightlife and other lively aspects of the Hospitality District that disturbed them personally.

223. Based on questions and answers at COR's council meetings between elected official and COR staff who has largely turned over in key roles, it became apparent that the institutional knowledge of how well the online portal had worked in the past was all but gone at COR.

224. Repeated calls to 911 wherein individuals speculated as to the origins of music and noise became rampant. When they were not addressed to the satisfaction of the small group complaining, they enhanced their efforts by posting "Recall Baldwin" signs in their yards and windows.

225. COR responded to the complaints and the small group's approach by dispatching its RPD Hospitality Squad, led by a newly appointed lieutenant – Defendant Capt. Robert Bowen – as described above.

226. Again, at the invitation of the Mayor, an updated draft lawsuit challenging the constitutionality of the noise scheme was shared for consideration in the hopes that the same, effective, and harmonious outcome would be realized.

227. The City Attorney who had reviewed the first draft and who gave COR, upon information and belief, his opinion that they were not likely to win such a dispute, had retired. A new City Attorney – Defendant Robin Lea Tatum – was now in place.

228. Instead of receiving the updated draft in the manner in which it was submitted – with the hope of a return to the symbiotic, pre-pandemic state – COR and the other Defendants doubled-down on their enforcement activities, constitutional rights aside.

229. As indicated above, more and more citations were issued to HDEP permittees. Defendants dispatched the RPD Hospitality Squad to force HDEP permittees into submission.

230. Citations were appealed but none was ever heard by COR. All corresponding criminal noise citations issued by the police to Plaintiffs, or their staffs were eventually dismissed.

231. Instead, as also indicated above, COR turned its enforcement efforts to deploy building and zoning officials to force compliance with the

unconstitutional noise regulations through severe and aggressive enforcement of new zoning, building, and occupancy interpretations.

232. Upon information and belief, COR's former Chief Building Official Leon Skinner rebuffed Defendants' – in particular Defendant Robin Lea Tatum's – requests to press pretextual Building Code violations against The Village.

233. Bryan Robinson, a former Building Inspector for COR who later became its Chief Building Official, nevertheless sent notices of violation and an email to Mr. Lovenheim and The Village claiming all manner of "life and safety" and zoning violations.

234. Mr. Robinson also posted blue "unsafe property" notice at The Village.

235. Upon information and belief, Mr. Robinson's promotion to replace Mr. Skinner as COR's Chief Building Official upon his retirement was held over his head by Defendants until he complied with Defendants' scheme to use Zoning and Building enforcement to force The Village into complying with COR's unconstitutional noise and HDEP schemes.

236. Upon further information and belief, the "unsafe property" placards posted at The Village were created at the direction of Defendant Robin Lea Tatum and Mr. Robinson and other inspection officials had not previously seen such wording or such placards despite decades of experience in COR's Building Department.

237. Mr. Lovenheim and his counsel were at The Village when Mr. Robinson and another Building Inspector, Seth Langdon, came to post the 'unsafe

property' placards. When they were asked why they were posting the placards, Mr. Robinson responded "well, my signature was on the Notices of Violations" implying he was being told by Defendants to place the placards.

238. Mr. Lovenheim appealed The Village's building code violations to the North Carolina Department of Insurance ("DOI"). Defendant Robin Lea Tatum responded to Mr. Lovenheim's appeal with a letter to DOI stating several demonstrable falsehoods with the direct intent of closing The Village. Ms. Tatum also conveyed that the City would come after the remainder of Mr. Lovenheim's bars and shut them down in the same manner as The Village unless Mr. Lovenheim withdrew his appeals and closed The Village. Based on this threat and having been given only three house to make a decision, Mr. Lovenheim withdrew his appeals and closed The Village.

239. Recognizing that all of his businesses could be closed and his hundreds of employees left out of work, Mr. Lovenheim made the impossible choice and withdraw all appeals and voluntarily closed The Village.

240. The next day, COR held a hearing to officially close The Village stating there were "imminent life safety concerns." Defendant Robin Lea Tatum and an Assistant City Attorney were present to marshal the official closure of the same business that had agreed to close the previous day.

241. Even though Mr. Lovenheim complied with Robin Lea Tatum's demands to withdraw all appeals and voluntarily close The Village, On 16 September 2022 Alchemy was issued notices of violation from COR and forced to

close its back patio despite having been given "outdoor occupancy" permits from COR and having multiple fire, zoning and safety inspections in the months prior to closure.

242.    All notices of violation for alleged Building and Zoning issues for both The Village and Alchemy were issued after both businesses had passed all inspections and had been in operation for years. Both businesses had frequent COR inspections in 2020, 2021, and 2022.

243.    Retaliatory health and safety citations and "unsafe property" placards were placed on those HDEP permittees' premises who pushed back hardest to COR's noise ordinance demands despite those locations having previously been subjected to repeated and regular inspections and having been issued occupancy permits for their operation.

244.    During roughly the same time period, COR's council and staff – including Police Chief Estella Patterson and Defendant Capt. Robert Patrick Bowen – began admitting that its noise ordinance scheme had problems with enforceability.

245.    COR's council and staff set about to study the issue.

246.    Months went by. Draft replacement ordinances were shared, discussed, and promoted and comments were solicited from the public.

247.    COR received public comments indicating that the two proposed schemes also suffered from constitutionality and enforceability concerns.

248.    After making some changes to broaden the scope of businesses who

would be subjected to the new permitting scheme, COR enacted the Nightlife Permit Ordinance on 5 December 2023.

### The New Nightlife Permitting Scheme

249.    After making some changes to broaden the scope of businesses who would be subjected to the new permitting scheme, COR enacted the Nightlife Permit Ordinance on 5 December 2023. A true and accurate copy of which is attached as **Exhibit 6**.

250.    The Nightlife Permit Ordinance includes a reference to N.C. GEN. STAT. §160A-174 in its stated authority to regulate.

251.    N.C. GEN. STAT. §160A-174 provides:

**§ 160A-174. General ordinance-making power.**

(a)    A city may by ordinance define, prohibit, regulate, or abate acts, omissions, or conditions, detrimental to the health, safety, or welfare of its citizens and the peace and dignity of the city, and may define and abate nuisances.

(b)    A city ordinance shall be consistent with the Constitution and laws of North Carolina and of the United States. An ordinance is not consistent with State or federal law when:
   (1)    The ordinance infringes a liberty guaranteed to the people by the State or federal Constitution;
   (2)    The ordinance makes unlawful an act, omission or condition which is expressly made lawful by State or federal law;
   (3)    The ordinance makes lawful an act, omission, or condition which is expressly made unlawful by State or federal law;
   (4)    The ordinance purports to regulate a subject that cities are expressly forbidden to regulate by State or federal law;
   (5)    The ordinance purports to regulate a field for which a State or federal statute clearly shows a legislative intent to provide a complete and integrated regulatory scheme

==to the exclusion of local regulation;==

**(6)** The elements of an offense defined by a city ordinance are identical to the elements of an offense defined by State or federal law.

The fact that a State or federal law, standing alone, makes a given act, omission, or condition unlawful shall not preclude city ordinances requiring a higher standard of conduct or condition.

(emphasis added.)

252. The Nightlife Permit Ordinance also recites N.C. GEN. STAT. § 160A-181 in its stated authority to regulate.

253. N.C. GEN. STAT. §160A-181 provides:

**§ 160A-181. Regulation of places of amusement.**

A city may by ordinance regulate places of amusement and entertainment, and may regulate, restrict or prohibit the operation of pool and billiard halls, dance halls, carnivals, circuses, or any itinerant show or exhibition of any kind. Places of amusement and entertainment shall include coffee houses, cocktail lounges, night clubs, beer halls, and similar establishments, ==but any regulations thereof shall be consistent with any permits or licenses issued by the North Carolina Alcoholic Beverage Control Commission.==

(emphasis added.)

254. Sec. 12-2118 of the Nightlife Permit Ordinance defines a "Nightlife establishment" as follows:

***Nightlife establishment*** *shall* mean an establishment of assembly intended for food and/or drink consumption where all of the following are met:

1. The establishment falls within any one of the following:

    a. Assembly Group A-2 under the N.C. Fire Code,

    b. Amusement arcade, bowling alley, community hall, or pool and billiard parlors under Assembly Group A-3 of

Page **59** of **87**

the N.C. Fire Code,

       c.     Bar, tavern, nightclub, or similar business that falls within section 203 of the most recent edition of the N.C. Fire Code;

       2.     Live or recorded entertainment is provided after 11:00 p.m.; and,

       3.     Alcoholic beverage consumption is allowed.

255.    Sec. 12-2122 of the Nightlife Permit Ordinance provides:

Any change in the ownership of a business after the issuance of the permit *shall* immediately invalidate the permit and require the new owner to reapply for a permit. A change in ownership *shall* mean acquisition of more than ten percent of the stock in a publicly traded corporation, any change in the ownership of shares in a privately held corporation, sale of all or part of a sole proprietorship, or any change in the membership of any form of limited liability organization.

256.    Each of the Plaintiffs' places of business meets the definition of a "Nightlife establishment" under the Nightlife Permit Ordinance.

257.    The third referenced basis for the authority for the Nightlife Permit Ordinance is N.C. GEN. STAT. §160A-174 which provides:

**§ 160A-184.  Noise regulation.**

A city may by ordinance regulate, restrict, or prohibit the production or emission of noises or amplified speech, music, or other sounds that tend to annoy, disturb, or frighten its citizens.

258.    The Nightlife Permit Ordinance does not, on its face regulate "noise."

259.    Rather, the penalty provisions in the Nightlife Permit Ordinance amplify and multiply penalties levied against non-permittees for the same infractions. A $100 penalty for a noise ordinance infraction for a non-permittee can

be a $5,000 penalty for a permittee or even a twelve-month revocation of the permit. Sec. 12-2124.

260. Such amplified penalties are excessive and violate Plaintiffs' rights vested in the Eighth and Fourteenth Amendments to the United States Constitution.

261. Plaintiffs being subject COR's Nightlife Permit Ordinance owing to their provision of live or recorded entertainment (and their patrons' rights to receive same) is an unlawful tax and restriction on protected First Amendment activities.

262. At a training session conducted by a COR staffer from the Office of Special Events confirmed an attendee's understanding that without a Nightlife Permit, an operator would have to change one of the three required criteria under Sec. 12-2118 to operate. That is, COR's position is that without obtaining the Nightlife permit and paying its corresponding fees, a business would have to either change its zoning or fire code status, close at 11:00 p.m. (i.e. cease all entertainment), or stop permitting the consumption of alcohol at 11:00 p.m. A restaurant or bar can no more change that fact that they are an A2 Assembly (or other qualifying classification), than a person can change the fact that they are human.

263. Chapter 18B of the General Statutes are the statutes encompassing the State's regulation of Alcoholic Beverages. The initial provision of Chapter 18B provides:

**§ 18B-100. Purpose of Chapter.**

> This Chapter is ==intended to establish a uniform system of control over the sale, purchase, transportation, manufacture, consumption, and possession of alcoholic beverages in North Carolina==, and to provide procedures to insure the proper administration of the ABC laws under a uniform system throughout the State. This Chapter shall be liberally construed to the end that the sale, purchase, transportation, manufacture, consumption, and possession of alcoholic beverages shall be prohibited except as authorized in this Chapter. If any provision of this Chapter, or its application to any person or circumstance, is determined by a court or other authority of competent jurisdiction to be invalid or unconstitutional, such provision shall be stricken and the remaining provisions shall be construed in accordance with the intent of the General Assembly to further limit rather than expand commerce in alcoholic beverages, and with respect to malt beverages, unfortified wine, and fortified wine, the remaining provisions shall be construed to enhance strict regulatory control over taxation, distribution, and sale of alcoholic beverages through the three-tier regulatory system and the franchise laws imposed by this Chapter. ==Except as provided in this Chapter, local ordinances establishing different rules on the manufacture, sale, purchase, transportation, possession, consumption, or other use of alcoholic beverages, or requiring additional permits or fees, are prohibited.==
>
> (emphasis added.)

264.    The North Carolina General Assembly preempted the field and is the sole regulator of alcohol possession, sale, and consumption in North Carolina save and except some minor authority specifically delegated to cities and counties to regulate bars in a manner not inconsistent with state law.

265.    As ABC permittees, Plaintiffs are permitted hours of operation for alcohol sales (7:00 a.m. to 2:00 a.m.) and consumption (7:00 a.m. to 2:30 a.m.). N.C. GEN. STAT. § 18B-1004.

266.    Neither Chapter 18B nor any other provision of state law – including those referenced in the Nightlife Permit Ordinance – provides COR with the

authority to adopt and enforce an ordinance limiting Plaintiffs' regulated hours for on-premise consumption to 11:00 p.m.

267. The Nightlife Permit Ordinance thus, violates Plaintiffs' rights vested by Article I, Sec. 1 of the North Carolina Constitution.

268. Plaintiffs and their patrons have a First Amendment right to provide and receive "live and recorded entertainment" at all times.

269. The Nightlife Permit Ordinance does not define "live and recorded entertainment."

270. COR's Nightlife Permit Ordinance purporting to require Plaintiffs, as a particular subset of ABC Permittees, to obtain a Nightlife Permit and pay additional fees is expressly prohibited by STAT. § 18B-100.

271. Thus, an ultimatum from COR to close an ABC permitted establishment at 11:00 p.m. or to stop consuming alcohol in that ABC permitted establishment outside the hours the NC ABC Commission as set forth statewide, runs contrary to is expressly prohibited by STAT. § 18B-100.

272. Plaintiffs' and their patrons' rights are not dependent on their designation as an A2 Assembly, the subset of A3 Assemblies described in the ordinance, or a "bar, tavern, nightclub, or similar business" under the NC Fire Code.

273. COR's new ordinance purporting to require some businesses but not other, similarly situated businesses to obtain the new Nightlife Permit and pay additional fees violates the Equal Protection Clause of the United States

Constitution.

274.    Sec. 12-2119(b) of the Nightlife Permit Ordinance provides:

(b)    If requested within ninety (90) days after the effective date of this ordinance, a *Nightlife establishment* that held an amplified entertainment permit or a hospitality district entertainment permit on the effective date of this ordinance shall be issued a *Nightlife permit* valid through June 30, 2024:

    i.    without cost after providing proof that the *Nightlife establishment* has installed a shunt breaker and confirming the name, telephone numbers, and e-mail addresses of the *persons* responsible for operation of the establishment, including the *manager,* in a manner determined by the City;

    ii.    at the fee established for annual renewals, after confirming the name, telephone numbers, and e-mail addresses of the *persons* responsible for operation of the establishment, including the *manager,* in a manner determined by the City.

275.    Despite Sec. 12-2119(b), COR is insisted that Plaintiffs holding HDEP or AEP permits must obtain a Nightlife Permit prior 3 February 2023 or they would not be able to operate past 11:00 p.m. if they continue to "provide live or recorded entertainment" and the consumption of alcohol.

276.    Upon information and belief, the Nightlife Permit Order is defective, improper, without authority, inconsistent with state law, and violative of Plaintiffs' rights.

## The New General, City-Wide Noise Ordinance
### Raleigh City Code §§ 12-5001 – 12-5011

277.    On 2 January 2024, the Raleigh City Council approved changes to the noise and amplified entertainment ordinance repealing former Part 12, Chapter 5 (sections 12-5001 through 12-5011) and replacing it. A true and accurate copy of the new noise regulatory scheme is attached as **Exhibit 4**.

278. Section 12-5001 contains new definitions including

    a.      "Daytime hours" 7:00 a.m. to 11:00 p.m.;

    b.      "Nighttime hours" 11:00 p.m. to 7:00 a.m.

    c.      "Plainly Audible" Any sound or vibration caused by sound that can be detected by a reasonable person of ordinary sensitivities using their unaided hearing faculties;

    d.      "Person" Any individual, corporation, partnership, firm, association, trust, estate, public or private institution, group, agency, political subdivision of this State, any other state or political subdivision or agency thereof or any legal successor, representative, agent or agency of the foregoing.

    e.      "Reasonable Person" A person of normal and ordinary sensitivities who is within the area of the audibility or perceptibility of the noise or vibration that transmits sounds which disrupt the reasonable conduct of basic human activities, such as conversation, sleep, work and other such activities;

    f.      "Sound source" Any person, animal, device, operation, process, activity, or phenomenon which emits or causes sound; and

    g.      "Unreasonable Noise" The unreasonable making of, or knowingly and unreasonably permitting to be made, any sound that is an unreasonably loud, boisterous, or unusual noise, disturbance, commotion, or vibration due to bass levels or other sources from any dwelling, building,

other structure, or privately-owned outdoor property, or upon any public street, park or other place or building. Any sound that is ordinary and normal to the operation of these places when conducted in accordance with the usual standards of practice, including standards for noise mitigation, and in a manner that will not unreasonably interfere with the peace and comfort of neighbors or their guest, or operators or customers in places of business, or detrimentally or adversely affect such residences or places of business, shall not be enforced as an unreasonable noise.

279. Section 12-5003 of the new scheme is entitled "General Prohibitions." It provides:

(a) No person shall make or continue to make:

(1) Any plainly audible unreasonably loud or raucous noise;

(2) Any plainly audible noise which unreasonably disturbs, injures, or endangers the comfort, repose, health, peace or safety of reasonable persons of normal and ordinary sensitivities;

(3) Any plainly audible noise that is so harsh, prolonged, unnatural or unusual in time or place as to occasion unreasonable discomfort to any reasonable persons within the vicinity of the location from which that noise emanates, or as to unreasonably interfere with the peace and comfort of neighbors or their guests, or operators or customers in places of business, or as to detrimentally or adversely affect such residences or places of business.

(b) Factors for determining whether a sound is unreasonably loud or raucous include, but are not limited to:

(1) The proximity of the sound to sleeping facilities, whether residential or commercial;

(2) The land use, nature, and zoning of the area from which the sound emanates and the area where it is received;

(3) The time of day or night the sounds occurs;

(4) The duration of the sound; and

(5) Whether the sound is recurrent, intermittent, or constant.

(c) Violation of this section is a misdemeanor and may also be enforced pursuant to § 12-5011 or a combination of remedies.

280. Despite the holding of *State v. Garren*, 117 N.C. App. 393, 451 S.E.2d 315, (1994), the new noise scheme contains a litany of "Prohibited Noises" which are, without limitation, declared to be "plainly audible unreasonable noise, the emission of which shall be unlawful:"

a. The sounding of any horn or signal device on any automobile, motorcycle, bus or other vehicle while not in motion, except as a danger signal, or if in motion, only as a danger signal after or as brakes are being applied and deceleration of the vehicle is 5 intended; the creation by means of any such signal device of any unreasonably loud or harsh sound; and the sounding of such device for an unnecessary and unreasonable period of time.

b. The use of any gong or siren upon any vehicle other than police,

fire, ambulance or other emergency vehicles.

c.     The playing of any radio, phonograph, amplifier, television, stereo, tape deck, tape recorder, musical instrument, or similar device in such a manner or with such volume during the nighttime hours as to annoy or disturb the quiet, comfort or repose of any reasonable person in any dwelling, hotel, motel or other type of residence.

d.     The use of any automobile, motorcycle or other vehicle so out of repair, so loaded, so modified, or driven in such a manner as to be plainly audible at a distance of fifty (50) feet from any reasonable person so as to create unreasonably loud, grating, grinding, rattling or other noise.

e.     The blowing of any steam whistle attached to any stationary boiler, except to give notice of the time to begin or stop work or as warning of danger.

f.     The discharge into the open air of the exhaust of any stationary internal combustion engine or motor vehicle, except through a muffler or other device which will effectively prevent unreasonably loud or explosive noises therefrom.

g.     The erection (including excavating), demolition, alteration or repair of any building or other structure in a residential or business district other than between the hours of 7:00 a.m. and 8:30 p.m., except by permit from the building inspector when, in their opinion, such work will not create plainly audible unreasonable noise. Upon complaint in writing by the

occupant of property near the location of the work, the building inspector shall immediately revoke the permit and the work shall be immediately discontinued if the work is found to be unreasonable. The building inspector may permit emergency work in the preservation of public health or safety at any time.

h. The creation of any plainly audible unreasonable noise within one hundred and fifty (150) feet of a noise sensitive area. This section is only to be applied when an institution or sleeping area in a noise sensitive area is in session or in active use.

i. The creation of plainly audible unreasonable noise in connection with loading or unloading any vehicles, equipment, or the opening and destruction of bales, boxes, crates and containers.

j. The creation of plainly audible unreasonable noise in connection with the shouting and crying of peddlers, barkers, hawkers or vendors which disturbs the quiet and peace of the neighborhood. This section is to be applied only to those situations where the disturbance is not a result of the content of the communication, but due to the volume, location, timing, or other factors not based on content.

k. The use of any drum, loudspeaker or other instrument or device for the purpose of attracting attention by creation of plainly audible unreasonable noise to any performance, show or sale or display of merchandise.

l.     The conducting, operating or maintaining of any garage or filling station, or the repair, rebuilding or testing of any motor vehicle in any residential district, so as to cause plainly audible unreasonable noise to be emitted therefrom during the nighttime hours.

m.     The firing or discharging of firearms in the streets or elsewhere for the purpose of making noise or disturbance.

n.     The creation of plainly audible unreasonable noise by the operation of an airplane over the City by stunting, diving or otherwise operating an airplane for the purpose of advertising or otherwise.

o.     No person shall keep or maintain, or permit the keeping of, on any premise, owned, leased; occupied or controlled by such person, any animal or fowl otherwise permitted to be kept which, by habitual or frequent sound, cry, howling, barking, squawking, meowing or other plainly audible unreasonable noise, shall disturb the quiet, comfort or repose of any reasonable person.

p.     The unreasonably loud and raucous use or operation on public places, City rights-of-way, or on public vehicular areas of any sound amplifier, bullhorn, loudspeaker, public address system, or other similar device,  when operated in such a manner as to be plainly audible during nighttime hours at a distance of fifty (50) feet from any reasonable person, and during daytime hours, at a distance of three hundred (300) feet from any reasonable person, other than the player(s) or operator(s) of the device,

and those who are voluntarily listening to the sound, and unreasonably disturbs a reasonable person is prohibited and is a violation of this section.

q. Unreasonable noise from the premises of any commercial establishment, including any outdoor area which is part of or under the control of the establishment, during nighttime hours that is plainly audible at a distance of one hundred and fifty (150) feet from the property line of the sound source, and during daytime hours, that is plainly audible at a distance of three hundred (300) feet from the property line of the sound source is prohibited and is a violation of this section.

281. Violation of the new noise scheme is punishable by both criminal and civil penalties and COR can obtain injunctive and equitable relief to enforce the scheme.

282. Upon information and belief, in the nine plus months since the new Nightlife permitting scheme has been in effect, COR's Office of Hospitality and Special Events – the department tasked with enforcement – has only required approximately ten percent (10%) of the Nightlife Establishments in COR to obtain the permit.

283. Of those ten percent (10%) of Restaurants and Bars which are being regulated with the Nightlife Permit Citywide, one in five have common ownership which includes Lovenheim.

284. According to COR's website, only fifteen Nightlife Permits have been issued to businesses in The Glenwood South Entertainment District out of the 60-

plus businesses which, according to the Nightlife Permit Ordinance and its definitions, are required to have a permit.

285. Upon information and belief, as of 12 August 2024, the week The Village reopened, there were approximately 587 businesses with full On Premises Mixed Beverage ABC permits in COR's jurisdiction (https://abc2.nc.gov/Search/PermitSearch - 517 Active Permits in Raleigh https://abc2.nc.gov/Search/PermitSearch - 70 Temp Permits in Raleigh (see attachment).

286. Upon further information and belief, at least 450 of the 587 ABC Mixed Beverage permit holders are open past 11:00 p.m. and provide "live or recorded entertainment," requiring them to have a Nightlife Permit

287. In August 2024, The Village was in the process of reopening including obtaining the appropriate building permits and scheduling and obtaining the appropriate building, zoning, and fire inspections.

288. Upon information and belief, COR and its personnel – including Defendant Whitney Leigh Shoenfeld – began monitoring activity and making inquiries with others in COR regarding The Village in an effort to be "proactive" regarding the opening of certain specific Nightlife Establishments.

289. Having obtained all the necessary building and zoning permits, inspections and approvals, and seeing the lack of enforcement by COR in failing to require the vast majority of Nightlife Establishments in COR to obtain Nightlife Permits prior to operation, The Village restarted its operations on Thursday 15

August 2024, Mr. Lovenheim's fathers' birthday.

290. Within hours – the Office of Hospitality and Special Events made further inquiries of COR staff indicating that a "nearby resident" sent a video showing "lights on," "people walking around at 11:15 p.m." indicating that "there was also loud music" but admitting that it was difficult to tell whether the music was coming from The Village or a nearby venue.

291. On Friday 16 August 2024, RPD appeared at The Village asking to talk with Mr. Lovenheim. Mr. Lovenheim greeted the officers who asked Mr. Lovenheim if The Village had obtained a Nightlife permit. Mr. Lovenheim confirmed that The Village had not yet obtained a Nightlife permit much the same as most of the eligible businesses in Raleigh had not. Mr. Lovenheim asked whether The Village would be cited and the officer responded, not at this time.

292. The Village has received two citations for "unreasonable noise" on 18 August 2024.

293. On Wednesday 21 August 2024, RPD requested to meet with Lovenheim at his office on Glenwood Avenue. Three armed officers donned in body armor appeared with another COR official to serve Lovenheim with a Civil Citation No. 82 for "Civil Penalty for Amplified Entertainment Permit/Hospitality District Entertainment Permit Violation" (the repealed regulatory scheme) for The Village not having a Nightlife Permit. The citation indicates it was signed on 21 April 2024 – four months before.

294. In addition, RPD's officer in charge of drafting local government

opinions for ABC permitting began to "question" the validity of The Village's ABC permits which extend over three parcels. The Village received its permanent ABC license on 31 March 2021. COR has and continues to escalate its "issue" with the North Carolina ABC Commission which has necessitated Mr. Lovenheim and The Village to engage counsel to confirm the propriety of all ABC permitting at The Village.

295.    On Friday 23 August 2024, The Village was issued a warning from RPD officers for failure to have a Nightlife Permit despite acknowledging that The Village had applied for the permit.

296.    On Saturday 24 August 2024, The Village received another citation for "unreasonable noise" citation.

297.    On Saturday 24 August 2024 at 1:24 a.m., The Village and its manager were issued RPD Civil Penalty Violation No. A00181 for a second violation of RCC 12-5007(q) for "unreasonable noise from the premises of any commercial establishment that can be heard 150 feet from the property line during nighttime hours, or 300 feet from the property line during daytime hours." The RPD officer issuing the citation – Sgt. Rattelade – indicated that he had taken "a reading" 157 feet from the premises and that the music was "plainly audible" at that distance. That conversation took place less than 10 feet from the premises and music in the background at that distance is barely audible. The new noise ordinance has no reading requirement. Further, Sgt. Rattelade told The Village's manager that he "was just the messenger."

298. On 29 September about 12:05am, Officer Epps issued manager John Zimmerman a criminal noise citation at another bar owned by Mr. Lovenheim on the same block as The Village and Alchemy. Officer Epps threatened to seize Mr. Lovenheim's 100K stereo as evidence two different times during the encounter.

299. In all, The Village and its personnel have been issued ten citations: four civil citations for "unreasonable noise;" three criminal citations for "unreasonable noise;" and three civil citations for not having a Nightlife permit, the last two of which was issued after The Village passed its inspections and paid for its Nightlife permit. All citations have been or will be appealed.

## FIRST CAUSE OF ACTION
### Violation of Equal Protection
### 42 U.S.C. § 1983; U.S. Const. Amend I, VIII and XIV

300. Each and every paragraph of this Complaint is repeated, realleged, and incorporated herein by reference as if fully set forth herein.

301. The Defendants are persons under 42 U.S.C. § 1983.

302. The Defendants, through those named and other representatives known and unknown, have acted and threaten to act under the color of authority or, in the alternative, under the color of state law (G.S. § 160A-184) to enact and enforce COR's noise regulations, policies and schemes.

303. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees uniform application of First Amendment principles.

304. Content-based regulation of speech is inherently suspect absent

narrowly tailored restrictions supported by compelling governmental interests.

305. Creating a regulatory scheme that significantly decreases rights of citizens in certain districts or types of speech based on its purpose, while not restricting religious and educational speech or the exact same speech in other districts, is both arbitrary and an impermissible content-based restriction.

306. Creating and enforcing such a scheme dilutes the rights of those affected in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and of Article I, Section 19 of the North Carolina Constitution.

307. Creating and enforcing such a scheme to amplify fines and civil penalties for violations against Plaintiffs and others similarly situated also violates the Eighth Amendment' protections against excessive fines.

308. Retaliating against Plaintiffs for their speaking out against the noise and permitting schemes of the COR is an affront to First Amendment principles including the right to petition the government for redress of grievances. Doubling-down to falsely assert that Plaintiffs did not have the proper safety inspections and approvals seeking to extract compliance with unconstitutional and non-enforceable sound regulation is a further affront to Plaintiffs' rights.

309. Plaintiffs, and those similarly situated to them, have been and will continue to be harmed by having their state and federal constitutional rights diluted and abridged as a result of the defendant City of Raleigh's noise and nightlife permit regulatory schemes, policies, practices, and pretextual

enforcement practices.

310. Because COR's noise, amplified entertainment, hospitality district entertainment permit regulatory schemes, and nightlife permit regulatory policies and practices unconstitutionally restricted and continue to restrict Plaintiffs' constitutional rights without legitimate justification, they should be enjoined.

### Second CAUSE OF ACTION
**"Fruits of their Own Labor"**
**N.C. Const. Art. I, §§ 1 and 19**

311. Each and every paragraph of this Complaint is hereby repeated, realleged, and incorporated herein by reference as if fully set forth.

312. This claim is brought by Plaintiffs against individual Defendants, who are sued under this claim in their official and individual capacities.

313. This claim is also brought against COR, which is sued under this claim for the acts of its employees and officers.

314. COR, on information and belief, has waived immunity for this claim on behalf of COR, its officers and other personnel acting in their official capacities. Upon information and belief, COR has waived immunity for this claim on its behalf and its personnel acting in their official capacities.

315. Section 1 of the North Carolina Constitution declares that North Carolinians are entitled to "the enjoyment of the fruits of their own labor." And Section 19 provides that no North Carolinian will be "deprived of his life, liberty, or property, but by the law of the land."

316. Our state courts have construed these provisions to guarantee a

fundamental "right to earn a living," of which state actors "run afoul . . . when they arbitrarily interfere with . . . the operation of business." *Kinsley v. Ace Speedway Racing, Ltd.*, 284 N.C. App. 665, 675 (2022) accord, *Kinsley v. Ace Speedway Racing, Ltd.* (23 August 2024 Slip. Op. Case No. 280PA22).

317. COR personnel, expressly, arbitrarily, and without legal justification sought to force Plaintiffs to close their businesses on pretextual zoning and building enforcement schemes despite admitting that COR's noise and permitting scheme were unenforceable.

318. Defendants violated Plaintiffs' equal-protection rights when they (1) singled them out for enforcment based on (2) the desire to prevent them the exercise of constitutional rights-specifically, Plaintiffs' "right to earn a living" and Plaintiffs' right to pursue operation of their businesses and in retaliation for their speech. N.C. Const. Art. I, §§ 1 and 19.

319. Through a persistent pattern of harassment and other arbitrary interference, Defendants succeeded in their effort to have Plaintiffs close, at least in part, and are again selectively and arbitrarily targeting Plaintiffs with enforcement of COR's new noise and Nightlife Permitting scheme.

320. As a direct and proximate result of Defendants' conduct, Mr. Lovenheim was forced to shutter The Village along with Alchemy's back patio, resulting in Plaintiffs' emotional and pecuniary damages.

321. Given COR's recent and continuing efforts vis-à-vis The Village in failing to issue a Nightlife permit and raising after-the-fact "ABC issues" suggests

COR and some or all of the other Defendants suggests that COR is again is seeking to intimidate and harass Plaintiffs into complying with its unconstitutional and illegal noise and permitting schemes.

322. Plaintiffs do not have an adequate state remedy.

323. Plaintiffs enjoy a direct cause of action against these Defendants for the violation of Plaintiffs' rights as guaranteed by the North Carolina Constitution.

**THIRD CAUSE OF ACTION**
**"Selective Enforcement"**
**N.C. Const. Art. I, § 19**
(North Carolina law)

324. Each and every paragraph of this Complaint is repeated, realleged, and incorporated herein by reference as if fully set forth.

325. Article I, Section 19 of the North Carolina Constitution guarantee uniform application of First Amendment principles.

326. Content-based regulation of speech is inherently suspect absent narrowly tailored restrictions supported by compelling governmental interests.

327. Creating a regulatory scheme that significantly decreases rights of citizens in certain districts or types of speech based on its purpose while not restricting religious and educational speech or the exact same speech in other districts is both arbitrary and an impermissible content-based restriction.

328. Plaintiffs, and those similarly situated to them, have been and will continue to be harmed by having their constitutional rights diluted and abridged as a result of the defendant COR's noise, amplified entertainment, and hospitality district entertainment permit regulatory schemes, policies and practices.

329. Because the Defendants' noise, amplified entertainment, and hospitality district entertainment permit regulatory schemes, policies, enforcement activities, and practices unlawfully restrict and abridge the Plaintiffs' constitutional rights without legitimate justification, they should be enjoined.

## FOURTH CAUSE OF ACTION
*Monell* Claim and Supervisory Liability against Adams-David and Tatum
(42 U.S.C. § 1983)

330. Each and every paragraph of this Complaint is hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

331. At all times relevant to this Complaint, defendant Marchell Adams-David was a COR official and the final policymaker for COR with regard to all activities conducted within its jurisdiction. Defendant Marchell Adams-David actions and omissions during that time set the policy, custom or pattern and practice of COR and RPD.

332. As a COR official and the final policymaker for COR and RPD, Defendant Marchell Adams-David created, promulgated and maintained - with deliberate and callous indifference - customs or practices which promoted, facilitated, or condoned unconstitutional conduct against Plaintiffs.

333. Defendant Marchell Adams-David failed to adequately train, supervise, or discipline detectives in connection with fundamental investigative tasks implicating the constitutional rights of Plaintiffs

334. At all times relevant to this action, defendant Robin Lea Tatum was acting under color of law for COR.

335. Upon information and belief, Marchell Adams-David failed to supervise defendant Robin Lea Tatum. The failure to supervise Robin Lea Tatum was an actual and proximate cause of Plaintiffs' injuries and damages as pled herein.

336. Upon information and belief, defendant Marchell Adams-David failed to control, train, or discipline Defendants Robin Lea Tatum, Capt. Robert Patrick Bowen and Whitney Leigh Shoenfeld for the acts, omissions and objectively unreasonable police misconduct that caused the deprivation of Plaintiffs' constitutional rights.

337. Upon information and belief, defendant Marchell Adams-David knowingly acquiesced to, personally participated in, and had actual and constructive notice of, the transactions and occurrences that caused the deprivation of Plaintiffs' constitutional rights as described in this Complaint. Further, as described more fully above, the conduct of defendant Marchell Adams-David was shocking, reprehensible and demonstrated a reckless and callous indifference to Plaintiffs' constitutional rights.

338. Upon information and belief, the COR had in place a policy or custom of deliberate or callous indifference to the rights of certain businesses and their owners that proximately caused the deprivation of Plaintiffs' constitutional rights. Defendant Robin Lea Tatum's and Capt. Robert Patrick Bowen's shocking conduct is evidence of COR's policy or custom of deliberate and callous indifference to the rights of certain businesses and business owners.

339.   Upon information and belief, COR created, promoted, promulgated and/or maintained a policy that allowed, tolerated or encouraged a "code of silence" among municipal actors whereby other municipal personnel do not intercede or intervene against a municipal actor to prevent a constitutional injury.

340.   Upon information and belief, it was reasonably foreseeable COR that their policy or custom of deliberate or callous indifference to the rights of certain business and business owners would cause the deprivation of Plaintiffs' constitutional rights. Further, it is alleged that COR was on notice of the risk of injury to certain businesses and business owners by virtue of said policy or custom, COR disregarded such risk, and that Plaintiffs' injuries were the actual and foreseeable result of the reckless disregard of such risk.

341.   As a direct and proximate result of the acts and omissions of COR and each municipal defendant, Plaintiff has incurred damages in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

## **FIFTH CAUSE OF ACTION**
Conspiracy to Interfere with Civil Rights
against Adams-David, Bowen, Tatum, and Shoenfeld
(42 U.S.C. § 1995)

342.   Each and every paragraph of this Complaint is hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

343.   Defendants Marchell Adams-David, Capt. Robert Patrick Bowen, Robin Lea Tatum, and Whitney Leigh Shoenfeld did knowingly and intentionally

combine, conspire, and agree with each other to engage in a common and unlawful plan to deprive Plaintiffs of equal protection under the laws.

344.    The unlawful acts and omissions of Defendants to deny Plaintiffs equal protection under the law were motivated and aroused by invidious discriminatory animus against Plaintiffs their exercise of protected First Amendment rights.

345.    Defendants shared the same conspiratorial objective and acted in furtherance of their objective when each defendant, without limitation, agreed or conspired not to acknowledge Plaintiffs' proper exercise of their constitutional rights and agreed and conspired to utter, or fail to intervene in the uttering of, false and misleading statements about Plaintiffs to others.

346.    As a direct and proximate result of the conspiracy, Plaintiffs has been damaged and is entitled to recover damages from the Defendants in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

### SIXTH CAUSE OF ACTION
**Abuse of Process against Adams-David, Bowen, and Tatum**
(North Carolina Law)

347.    Each and every paragraph of this Complaint is hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

348.    Defendants Adams-David, Bowen, and Tatum as agents of the COR abused the building and zoning adjudication process against Plaintiffs and thereby caused unreasonable indignity and oppressive hardship to Plaintiffs.

349. Defendants Adams-David, Bowen, and Tatum acted with an ulterior motive to conceal their misconduct and perpetuated the building and zoning adjudication process against Plaintiffs after recognizing that COR's former noise and entertainment permitting schemes were unconstitutional and unenforceable as a means to improperly impose compliance via alternative means.

350. Defendants Adams-David, Bowen, and Tatum omitted, concealed, or otherwise failed to disclose COR's City Council and the North Carolina Department of Insurance that, Plaintiffs obtained the inspections, permits, occupancy certificates, and reviews, to permit them to operate lawfully.

351. Defendants Adams-David, Bowen, and Tatum willfully perverted the building and zoning adjudication process to force Plaintiffs' compliance with COR's former noise and entertainment permitting regulations and are again threatening unrelated ABC and building issues as a means to force Plaintiffs' compliance with COR's new and unconstitutional noise regulations.

352. As a direct and proximate result, Plaintiffs have been and will continue to be damaged and are entitled to recover damages from the Defendants in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

## SEVENTH CAUSE OF ACTION
Punitive Damages

353. Each and every paragraph of this Complaint is hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

354. As a direct and proximate result of the egregious, shocking, reckless, intentional and willful conduct of Defendants, as well as their conscious disregard of the rights and well-being of Plaintiffs, and other similarly situation businesses and business owners as alleged herein, Plaintiffs are entitled to recover punitive and exemplary damages under both federal and state law to punish Defendants for their reprehensible, wrongful, reckless, willful and wanton misconduct and to deter such conduct by others. Plaintiffs are entitled to recover punitive damages from Defendants, jointly and severally, in an amount to be determined by a jury.

WHEREFORE, Plaintiffs respectfully pray the Court:

1. Award temporary and permanent injunctive relief enjoining Defendants and those acting in concert with them from enforcing, implementing, or giving any effect to COR's noise regulatory schemes, policies and practices in their entirety whether directory or indirectly via punitive, selective, and retaliatory enforcement of building, zoning, or fire code regulations;

2. Declare that COR's noise and Nightlife regulatory schemes, policies and practices violate Plaintiffs' rights including those embodied in the First Amendment, Eighth Amendment, equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution;

3. Make all further orders as are just, necessary, and proper to preserve Plaintiffs' and others' rights to enjoy their state and federal constitutional rights.

4. Award Plaintiffs nominal damages.

5.    Award Plaintiffs compensatory damages in an amount in excess of $75,000.00 in an amount to be determined by a jury.

6.    Award Plaintiffs punitive damages.

7.    Award Plaintiffs their costs, disbursement, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988;

8.    Tax the costs of this action against Defendants; and

9.    Grant such other relief as this Court deems just and appropriate.

This the 3rd day of October 2024.

STEVENS MARTIN VAUGHN & TADYCH, PLLC

Michael J. Tadych
N.C. State Bar No. 24556
K. Matthew Vaughn
N.C. State Bar No. 20177
Hugh Stevens
N.C. State Bar No. 4158
Ashley N. Fox
N.C. State Bar No. 57896
225 W. Millbrook Road
Raleigh, NC 27612
919.582.2300
866-593-7695 toll free facsimile

*Attorneys for Plaintiffs*

**STATE OF NORTH CAROLINA**
**WAKE COUNTY**

## VERIFICATION

The undersigned Daniel A. Lovenheim, having been duly sworn, states that he is the Member/Manager of Glenpeace LLC, and the President of Jo Heaven, Inc., that he has read the foregoing Complaint and that the facts stated therein are true to the best of his knowledge or upon information and belief.

_____
Daniel A. Lovenheim

State of North Carolina)
Wake County)

Sworn to and subscribed before me by _Daniel Lovenheim_ on this the 3rd day of October 2024.


_____
Notary Public Signature

_Kimberly B. O'Sullivan_
Notary Public Printed Name

My commission expires: _November 8, 2028_